1  Maxwell M. Blecher (SBN 026202)
   James Robert Noblin (SBN 114442)
2  Matthew E. Hess (SBN 214732)
   BLECHER & COLLINS, P.C.
3  611 West Sixth Street, 20th Floor
   Los Angeles, CA   90017
4  Telephone:  (213) 622-4222
   Facsimile:   (213)  689 1944
5
   James A. Hennefer (SBN 059490)
6  HENNEFER & WOOD
   425 California Street, 19th Floor
7  San Francisco, CA 94104-2296
   Telephone: (415) 421-6100
8  Facsimile:   (415) 421-1815

9  Attorneys for Plaintiffs

10

                    IN THE UNITED STATES DISTRICT COURT
11
                 FOR THE NORTHERN DISTRICT OF CALIFORNIA
12

13  NEWCAL INDUSTRIES, INC., a California  )   CIVIL NO. C 04 2776JCS
    Corporation; CPO, LTD., a California   )
14  Corporation; PINNACLE DOCUMENT         )   **MEMORANDUM OF POINTS AND**
    SYSTEMS, INC., a California Corporation; )  **AUTHORITIES IN OPPOSITION TO**
15  PACIFIC OFFICE AUTOMATION, INC.,       )   **DEFENDANT IKON OFFICE**
    an Oregon Corporation;  and KEARNS     )   **SOLUTIONS, INC.'S MOTION TO**
16  BUSINESS SOLUTIONS, INC., a South      )   **DISMISS**
    Carolina Corporation,                  )
17                                         )
                   Plaintiffs              )
18                                         )
          vs.                              )   Date:        November 18, 2004
19                                         )   Time:        2:00 p.m.
    IKON OFFICE SOLUTIONS, INC., an Ohio   )   Place:       Courtroom 5
20  Corporation; and GENERAL ELECTRIC      )   Judge:       Hon. Fern M. Smith
    CAPITAL CORPORATION, a Delaware        )
21  Corporation,                           )
                                           )
22                 Defendants              )
                                           )
23  _____    )

24

25

26

27

28

# TABLE OF CONTENTS

**Page(s)**

I.  INTRODUCTION ........................................................ 1

II.  STATEMENT OF ISSUES TO BE DECIDED ................................ 2

III.  FACTS ............................................................ 2

    A.  IKON and the Office Equipment Lease Business ........................... 2

    B.  IKON's Misconduct ................................................... 3

IV.  IKON'S MOTION FAILS TO MEET THE STRINGENT STANDARD
APPLICABLE TO A MOTION TO DISMISS ................................. 5

    A.  Fed. R. Civ. P. 12(b)(6) Legal Standards ................................ 5

    B.  No Heightened Standard of Pleading Applies in Antitrust Cases .............. 6

V.  ARGUMENT

    A.  The Complaint Gives IKON Sufficient Notice of Allegations That It
Restrained Trade Under Section 1 of the Sherman Act (Claim 1) ............. 7

        1.  Market Definition Is a Question of Fact and Thus Not an Issue
That May Be Resolved on a Motion to Dismiss ...................... 7

        2.  Many Cases Have Found a Single-Brand Market .................... 8

        3.  This Case Is Controlled by Eastman Kodak Co. v. Image
Technical Services, Inc. ........................................ 8

        4.  The "Contract Power" Cases Relied Upon by IKON Are Inapposite
Where, as Here, Unrestrained Competition Could Not Take Place
Before the Formation of the Contract and Where the Misconduct Was
Designed to Thwart Such Competition .......................... 11

    B.  The Complaint Gives IKON Sufficient Notice of Allegations of Exclusive
Dealing (Claim 2) ................................................. 13

    C.  The Complaint Gives IKON Sufficient Notice of Allegations of a Section One
Tying Claim (Claims 3 & 4) ........................................ 14

D. The Complaint Gives IKON Sufficient Notice of Allegations of Monopolization and Attempt to Monopolize (Claims 5 & 6) . . . . . . . . . . . . . . . 15

E. Plaintiffs Need Not Prove Market Power to State an Antitrust Claim . . . . . . . . 15

F. The Complaint Gives IKON Sufficient Notice of Allegations of a Lanham Act Violation (Claim 7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

G. The Complaint Gives IKON Sufficient Notice of Allegations of a RICO Violation (Claim 8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

H. The Complaint Gives IKON Sufficient Notice of Allegations of Intentional Interference with Prospective Economic Advantage (Claim 10) . . . . . . . . . . . . 19

I. The Complaint Gives IKON Sufficient Notice of Allegations of Violation of Cal. Bus. & Prof. Code §§ 17200 and 17500 (Claims 11 & 12) . . . . . . . . . . . . 20

    1. Newcal's § 17200 Claim Satisfies the Article III Standing Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    2. The Complaint Gives IKON Sufficient Notice of Allegations of Violations of § 17200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        a. Plaintiffs' § 17200 Claim Is Not Dependent on Their Sherman Act Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    3. IKON's Contracts Are Actionable Under § 17200 . . . . . . . . . . . . . . . . . . . 24

VI. IF ANY PORTION OF THE COMPLAINT IS DEEMED DEFICIENT, LEAVE TO FILE AN AMENDED COMPLAINT SHOULD BE GRANTED . . . . . . . . . . . . . . . . . . . . . . . 24

VII. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

Alan Neuman Productions, Inc. v. Albright,

    862 F.2d 1388 (9th Cir. 1988), cert. denied, 493 U.S. 858 (1989) . . . . . . . . . . . . . . 18, 19

Allied Grape Growers v. Bronco Wine Co.,

    203 Cal. App. 3d 432 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

American Philatelic Society v. Claibourne,

    3 Cal. 2d 689 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 24

Atari Corp. v. 3DO Co.,

    No. C 94-20298, 1994 WL 723601 (N.D. Cal. May 16, 1994) . . . . . . . . . . . . . . . . . . . 17

Bondanza v. Peninsula Hospital & Medical Center,

    23 Cal. 3d 260 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

California Medical Ass'n, Inc. v. Aetna U.S. Healthcare of California, Inc.,

    94 Cal. App. 4th 151 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,

    20 Cal. 4th 163 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

Chavez v. Whirlpool Corp.,

    93 Cal. App. 4th 363 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.,

    228 F.3d 24 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Collins v. International Dairy Queen, Inc.,

    980 F. Supp. 1252 (M.D. Ga. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Committee on Children's Television, Inc. v. General Foods Corp.,

    35 Cal. 3d 197 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Concord Boat Corp. v. Brunswick Corp.,

    207 F.3d 1039 (8th Cir.), cert. denied, 531 U.S. 979 (2000) . . . . . . . . . . . . . . . . . . . . 14

Conley v. Gibson,

    355 U.S. 41, 78 S. Ct. 99 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Cook, Perkiss & Liehe, Inc. v. Northern California Collection Service, Inc.,

    911 F.2d 242 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Cost Management Services, Inc. v. Washington Natural Gas Co.,

    99 F.3d 937 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

DCD Programs, Ltd. v. Leighton,

    833 F.2d 183 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Datagate, Inc. v. Hewlett-Packard Co.,

    60 F.3d 1421 (9th Cir. 1995), cert. denied, 517 U.S. 1115 (1996) . . . . . . . . . . . . . . . . . 15

Davidowitz v. Delta Dental Plan of California, Inc.,

    946 F.2d 1476 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Digital Equipment Corp. v. Uniq Digital Technologies, Inc.,

    73 F.3d 756 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Eastman Kodak Co. v. Image Technical Services, Inc.,

    504 U.S. 451, 112 S. Ct. 2072  (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 10, 11, 14

Edwards v. Marin Park, Inc.,

    356 F.3d 1058 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Ernest W. Hahn, Inc. v. Codding,

    615 F.2d 830 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fednav Ltd. v. Sterling International,

    572 F. Supp. 1268 (N.D. Cal. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Flash Electronics v. Universal Music, 312 F. Supp. 2d 379 (E.D.N.Y. 2004) . . . . . . . . . . . . . . 16

Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board

    of Culinary Workers,

    542 F.2d 1076 (9th Cir. 1976), cert. denied, 430 U.S. 940 (1977) . . . . . . . . . . . . . . . . . . 6

Freeport Transit, Inc. v. McNulty,

    239 F. Supp. 2d 102 (D. Me. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

1  Friedman v. Jackson,

2       266 Cal. App. 2d 517 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

3  Giuliano v. Everything Yogurt, Inc.,

4       819 F. Supp. 240 (E.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

5  Hewlett-Packard Co. v. Arch Associates Corp.,

6       908 F. Supp. 265 (E.D. Pa. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

7  High Technology Careers v. San Jose Mercury News,

8       996 F.2d 987 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

9  Hospital Building Co. v. Trustees of Rex Hospital,

10      425 U.S. 738, 96 S. Ct. 1848 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

11 JM Computer Services, Inc. v. Schlumberger Technologies, Inc.,

12      1997-2 Trade Cas. (CCH) ¶ 72,024 (N.D. Cal. May 3, 1996) . . . . . . . . . . . . . . . . . . . . . 14

13 LaSalvia v. United Dairymen of Arizona,

14      804 F.2d 1113 (9th Cir. 1986), cert. denied, 482 U.S. 928 (1987) . . . . . . . . . . . . . . . . . 6

15 Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,

16      507 U.S. 163, 113 S. Ct. 1160 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

17 LePage's Inc. v. 3M,

18      324 F.3d 141 (3d Cir. 2003), cert. denied, 124 S. Ct. 2932 (2004) . . . . . . . . . . . . . . . . 13

19 Los Angeles Land Co. v. Brunswick Corp.,

20      6 F.3d 1422 (9th Cir. 1993), cert. denied, 510 U.S. 1197 (1994) . . . . . . . . . . . . . . . . . 15

21 Maris  Distributing Co. v. Anheuser-Busch, Inc.,

22      302 F.3d 1207 (11th Cir. 2002), cert. denied, 537 U.S. 1190 (2003) . . . . . . . . . . . . . 11, 12

23 Moore v. Kayport Package Express, Inc.,

24      885 F.2d 531 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

25 Newman v. Universal Pictures,

26      813 F.2d 1519 (9th Cir. 1987), cert. denied, 486 U.S. 1059 (1988) . . . . . . . . . . . . . . . . 6

27

28

1  Nobelpharma Ab v. Implant Innovations, Inc.,

2     930 F. Supp. 1241 (N.D. Ill. 1996), aff'd, 141 F.3d 1059 (Fed. Cir.),

3     cert. denied, 525 U.S. 876 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

4  Oltz v. St. Peter's Community Hospital,

5     861 F.2d 1440 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

6  Pine Ridge Recycling, Inc.v. Butts County,

7     855 F. Supp. 1264 (M.D. Ga. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

8  Portland Retail Druggists Ass'n v. Kaiser Foundation Health Plan,

9     662 F.2d 641 (9th Cir. 1981), cert. denied, 469 U.S. 1229 (1985) . . . . . . . . . . . . . . . . . . 6

10 Queen City Pizza, Inc. v. Domino's Pizza, Inc.,

11    922 F. Supp. 1055 (E.D. Pa. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

12 Queen City Pizza, Inc. v. Domino's Pizza, Inc.,

13    124 F.3d 430 (3d Cir. 1997), cert. denied, 523 U.S. 1059 (1998) . . . . . . . . . . . . . . . 11, 12

14 Reddy v. Litton Industries, Inc.,

15    912 F.2d 291 (9th Cir. 1990), cert. denied, 502 U.S. 921 (1991) . . . . . . . . . . . . . . . . . . 25

16 Rosenberg Bros. & Co. v. Arnold,

17    283 F.2d 406 (9th Cir. 1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

18 Rutman Wine Co. v. E. & J. Gallo Winery,

19    829 F.2d 729 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

20 Samura v. Kaiser Foundation Health Plan, Inc.,

21    17 Cal. App. 4th 1284 (1993), cert. denied, 511 U.S. 1084 (1994) . . . . . . . . . . . . . . . . . 24

22 Scheuer v. Rhodes,

23    416 U.S. 232, 94 S. Ct. 1683 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

24 Schiffels v. Kemper Financial Services, Inc.,

25    978 F.2d 344 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

26 Silicon Knights, Inc. v. Crystal Dynamics, Inc.,

27    983 F. Supp. 1303 (N.D. Cal. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

28

1   SmileCare Dental Group v. Delta Dental Plan of California, Inc.,

2       88 F.3d 780 (9th Cir.), cert. denied, 519 U.S. 1028 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . 6

3   Southland Sod Farms v. Stover Seed Co.,

4       108 F.3d 1134 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

5   Southwest Marine, Inc. v. Triple A Machine Shop, Inc.,

6       720 F. Supp. 805 (N.D. Cal. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

7   State Farm Fire & Casualty Co. v. Superior Court,

8       45 Cal. App. 4th 1093 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

9   Swierkiewicz v. Sorema N. A.,

10      534 U.S. 506, 122 S. Ct. 992 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

11  Systemcare, Inc. v. Wang Laboratories Corp.,

12      117 F.3d 1137 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

13  Systems Management, Inc. v. Loiselle,

14      303 F.3d 100 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

15  Syufy Enterprises v. American Multicinema, Inc.,

16      793 F.2d 990 (9th Cir. 1986), cert. denied, 479 U.S. 1031 (1987) . . . . . . . . . . . . . . . . . . . 7

17  Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.,

18      875 F.2d 1369 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

19  Twin City Sportservice, Inc. v. Charles O. Finley & Co.,

20      676 F.2d 1291 (9th Cir.), cert. denied, 459 U.S. 1009 (1982) . . . . . . . . . . . . . . . . . . . . . . . 8

21  U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.,

22      7 F.3d 986 (11th Cir. 1993), cert. denied, 512 U.S. 1221 (1994) . . . . . . . . . . . . . . . . . . . . 8

23  United Industries Corp. v. Clorox Co.,

24      140 F.3d 1175 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

25  United States v. E.I. du Pont de Nemours & Co.,

26      351 U.S. 377 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

27  United States v. Employing Plasterers' Ass'n,

28      347 U.S. 186, 74 S. Ct. 452 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

1   United States v. Webb,

2           655 F.2d 977 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

3   Usher v. City of Los Angeles,

4           828 F.2d 556 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

5   Virtual Maintenance, Inc. v. Prime Computer, Inc.,

6           11 F.3d 660 (6th Cir. 1993), cert. dismissed, 512 U.S. 1216 (1994) . . . . . . . . . . . . . . . . 10

7   Volmar Distributors, Inc. v. New York Post Co.,

8           825 F. Supp. 1153 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

9   Walker Distributing Co. v. Lucky Lager Brewing Co.,

10          323 F.2d 1 (9th Cir. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

11  Western Parcel Express v. United Parcel Service,

12          190 F.3d 974 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

13  Westside Center Associates v. Safeway Stores 23, Inc.,

14          42 Cal. App. 4th 507 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

15  Wisdom v. First Midwest Bank,

16          167 F.3d 402 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

17  Zimmerman v. Bank of America National Trust & Savings Ass'n,

18          191 Cal. App. 2d 55 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

19

20                          **STATUTES, RULES AND REGULATIONS**

21

22  15 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9, 13

23  15 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

24  Cal. Bus. & Prof. Code § 17200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 20, 21, 22, 23

25  Cal. Bus. & Prof. Code § 17204 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

26  Cal. Bus. & Prof. Code § 17500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

27  Fed. R. Civ. P. 8(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28  Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Fed. R. Civ. P. 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Local Rule 7-4(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**MISCELLANEOUS**

2A Phillip E. Areeda et al., <u>Antitrust Law</u> ¶ 516 (2d ed. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

4 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u>

§ 27:38 (4th ed. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

5 B. E. Witkin, <u>Summary of California Law</u> § 664 (9th ed. 1988) . . . . . . . . . . . . . . . . . . . . . . . 19

BAJI 7.82 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CACI 2202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## I.       **INTRODUCTION**

This case primarily concerns the misconduct of defendant IKON Office Solutions, Inc. ("IKON") and is brought by a number of IKON's competitors collectively referred to as "Newcal." IKON sells and services a wide array of office equipment. Consumers of such equipment typically lease it, often for a period of 60 months, but they do not generally lease all their office equipment at one time. Rather, they add pieces of equipment over time and arrange for service of equipment when added. Traditionally in the industry, in the last 30% of the lease term for the bulk of a consumer's office equipment, competition arises from other vendors that offer to begin servicing the existing equipment and, perhaps, replace and add equipment to the consumer's mix. Such competition results in lower prices, higher quality, and a greater array of product and service offerings for consumers.

To avoid these consequences of competition, IKON instituted a multifaceted scheme to lock in IKON consumers before they reached that last 30% of their contract term where competition could take place. As detailed below, IKON would defraud customers into executing what are known as "flexes," documents indicating that a customer was adding or changing the lease for a particular piece or pieces of equipment. Unbeknownst to the customer, the flex typically purports to extend the term of all the customer's equipment under lease with IKON for another extensive period, often an additional 60 months. Because of the peculiar accounting of office equipment, many customers never discover, or do not discover until much afterwards, the impact of the flex. If they contest the flex, they will typically be declared in default, with consequent damage to their credit rating, cut off from service, and be sued by IKON in a collection action. Rather than bear the high costs of contesting the flex, such customers almost always concede and remain an IKON customer rather than seek competitive alternatives. Indeed, IKON's own written description of these practices states that they make it "*virtually impossible for competition to penetrate [the] account.*"

Consequently, the statement in IKON's motion papers that that Newcal's "core assertion" is that "IKON willingly renegotiates its equipment leases with existing customers" (Memo Ps & As 1) could not be further from the truth. The problem is not *willing* negotiations. The problem is

1  a conscious and wide-spread scheme to defraud customers into unknowingly signing agreements

2  that put such customers, against their own wishes, beyond the reach of IKON's competitors.

3  **II.     STATEMENT OF ISSUES TO BE DECIDED**

4         Pursuant to Local Rule 7-4(a)(3), this Opposition to the Motion to Dismiss raises the

5  following issues:

6         1.  Whether IKON's scheme to restrain trade should be immunized by the mere existence
   of the competitors IKON foreclosed.

7
8         2.  Whether the extensive precedent establishing that exclusive dealing doctrine may be
   applied to contracts whose impact is exclusive as well as whose terms are explicitly exclusive
   should be disregarded.

9
10        3.  Whether <u>Eastman Kodak Co. v. Image Technical Services, Inc.</u>, 504 U.S. 451, 112 S.
   Ct. 2072  (1992) should be disregarded to dismiss Newcal's tying claims.

11        4.  Whether the inherently factual determination of distinguishing puffery from misleading
   advertising should be undertaken as a matter of law from the face of the complaint.

12
13        5. Whether Newcal's extensive pleading of the facts underlying its RICO claim should be
   deemed insufficient.

14        6. Whether IKON's argument in a footnote regarding dismissal of the Declaratory Relief
   claim justifies granting the relief IKON requests.

15
16        7. Whether the inherently factual question of the reasonable probability that Newcal's
   prospective customers would have become customers absent IKON's misconduct should be
   resolved on the face of the complaint.

17
18        8.  Whether the claims for violation of California Business & Professions Code §§ 17200
   and 17500 should be dismissed through an unprecedented holding that competitors lack standing to
   assert claims for unfair competition against other competitors.

19
20 **III.    FACTS**

21 _____**A.     IKON and the Office Equipment Lease Business**

22        IKON used to own a subsidiary known as IOS Capital, LLC ("IOS Capital") that was

23 merged into IKON effective March 30, 2004.  (Complaint ¶ 2.)  IKON and IOS Capital, and IOS

24 Capital's successors, IKON and IKON Financial Services (a division of GE Capital) sell to

25 consumers bundled cost-per-copy and other lease/rental contracts for copiers, printers and

26 facsimile equipment and for related servers, equipment, accessories and software.  (<u>Id.</u> ¶ 3.)  The

27 IKON contracts for initial equipment purchases provide businesses with equipment financing,

28 supplies, parts and service for fixed periods, typically for five (5) years.  (<u>Id.</u>)

1    The economics of these agreements dictate that, until about 70% of the lease term has run,

2    it is not practicable for a consumer or a competitor to make a deal to replace the IKON equipment

3    and service, even based on reasonable costs for a "buy-out" from IKON (which rarely occurred

4    because of IKON's practices and unreasonable "lease-end" charges).  (Id. ¶ 37.)  Within the

5    remaining period of the lease – the last 30% of the term – or upon its expiration, a competitive bid

6    by plaintiffs or another competitor of IKON and IOS Capital to replace Copier Equipment under an

7    IKON contract could practicably pay for or finance reasonable "buy-out" or "lease-end" charges

8    and could offer the consumer competitive bids to supply its Copier Equipment and/or service and

9    supply needs – if  IKON had not engaged in misconduct.  (Id.)

10       **B.**    **IKON's Misconduct**

11   To avoid allowing a customer to get to the last 30% of its lease term, IKON would defraud

12   customers into entering into one or more amendments to these contracts through additional false

13   and misleading pretexts and a pattern of fraudulent practices.  These amendments are known at

14   IKON as "flexes" and, unbeknownst to the customer, purported to enlarge IKON and IOS Capital's

15   rights and the customers' obligations to IKON and IOS Capital.  (Complaint ¶¶ 41-48.)  For

16   example, although the flex agreements often refer to a single insignificant piece of equipment,

17   IKON takes the position that they extend the term of all of the customer's leased equipment for an

18   extensive period, frequently an additional five years.  (Id.)

19   Indeed, IKON's Field Training Manual states that "the sales representative's primary

20   objective in flexing is to extend the term beyond the original date."  (Id.)  In order to achieve this,

21   IKON trained its sales representatives to conceal the fact that the term of the IKON Contract was

22   being extended and to use a pretext to get a customer's signature on the amendment.  (Id.)  The

23   pretexts used by IKON sales representatives to get the customer to sign the amendment came in

24   many varieties.  (Id.)  For example, they claimed that the customer was eligible to receive a "free"

25   machine by signing the flex.  (Id.;  Hennefer Decl. ¶32(b).)  They even added accessories, digital

26   servers, network connections or software at "no charge" as an inducement.  (Id.)

27   In these situations, the IKON representative intentionally would conceal the fact that the

28   term of the IKON Contract was extended by the amendment or would even misrepresent to the

1  customer that it was not extended.  (Id.)  A number of techniques were employed, in addition to the

2  pretexts identified above, to obtain a customer's signature on the amendment.  For example,

3  language in the amendment, in bold face, which explicitly warned that the original contract could

4  be extended by the amendment, was eliminated.  (Id. & Exh. B.)  Amendment forms were devised

5  where blanks that were not filled in, such as the length of the amendment term,  would default to

6  terms of the original agreement, creating an extension equal to that of the original term, usually 60

7  months.  (Id.; Hennefer Decl., ¶ 32(b).)  IKON sales representatives were trained not to bring the

8  original IKON Contract with them when approaching a customer in order to obtain an amendment

9  and not to mention the original IKON Contract or machines under that contract in meeting with the

10 customer.  (Id.)  IKON sales representatives were allowed and trained to get a signature on the

11 amendment from the lowest ranking person in the customer's office, not from the person

12 responsible for or knowledgeable about the IKON Contracts.  (Id.)  IKON sales representatives

13 took advantage of immediate and/or dire needs of customers, such as defective or broken

14 equipment that needed replacing immediately, to obtain a signature on the amendment.  (Id.)

15          The flex amendments provided the mechanism by which IKON would get exorbitant

16 payments from customers.  More specifically, they were used to obtain payments for Copier

17 Equipment after payment of the original fully amortized value of the equipment, beyond amounts

18 the customer intended or agreed to pay and greatly in excess of its fair market value.  (Id..)  For

19 instance, IKON demanded $65,000 for one customer's copier, when the copier had a fair market

20 value of only $5,000.  (Hennefer Decl. ¶ 32(b.)  They were also used to obtain exorbitant "buy-out"

21 payments for termination of IKON Contracts and amendments.  (Id.)  The net effect of these flex

22 agreements was to foreclose competition unreasonably for these IKON customers and to

23 monopolize the Copier Equipment and service markets for customers with IKON Contracts.  (Id.

24 ¶¶ 58-65.)  They were used to prevent competition for the customer from companies such as

25 Newcal, absent a cost-prohibitive "buy out" of the flex agreements.  (Id.)

26          IKON customers who attempted to challenge unlawfully obtained IKON Contracts,

27 amendments or buy-out charges faced an array of consequences.  For example, IKON would

28 continue billing (with penalties) for unlawful charges.  (Id.)  IKON would cut off service to the

1  customer's equipment.  (Id.)  IKON would make adverse credit reports concerning the customer.

2  (Id.)  IKON was even so bold as to sue the customer in a collection action.  (Id.; Hennefer Decl. ¶

3  32(h).)

4         As a consequence, IKON competitors such as plaintiffs have been foreclosed from selling

5  to many, many IKON customers.  (Id. ¶¶ 58-65.)  More fundamentally, the customers themselves

6  have had to suffer the higher prices, lower quality, and diminished choices that sprout like weeds

7  when competition is replaced by restraint and monopoly.  (Id.)  An especially egregious example

8  of the highly detrimental  effect of IKON's polices on prices paid by consumers is that of one

9  customer who found itself paying almost four times the market rate for copying services pursuant

10  to the "flex"agreements it unwittingly signed.  (Hennefer Decl. ¶ 32(h).)

11  **IV.    IKON'S MOTION FAILS TO MEET THE STRINGENT STANDARD**

12          **APPLICABLE TO A MOTION TO DISMISS**

13          **A.    Fed. R. Civ. P. 12(b)(6) Legal Standards**

14         A motion to dismiss for legal insufficiency under Fed. R. Civ. P. 12(b)(6) is a disfavored

15  motion that is rarely granted and then only in extreme circumstances.  Hospital Building Co. v.

16  Trustees of Rex Hospital, 425 U.S. 738, 746, 96 S. Ct. 1848, 1853 (1976). "On a motion to

17  dismiss..., the court must presume all factual allegations of the complaint to be true and draw all

18  reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d

19  556, 561 (9th Cir. 1987).

20         The Supreme Court has repeatedly instructed that a district court may not grant a motion to

21  dismiss for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no

22  set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S.

23  41, 45-46, 78 S. Ct. 99, 102 (1957). "'The issue is not whether a plaintiff will ultimately prevail

24  but whether the claimant is entitled to offer evidence to support the claims.'" Gilligan v. Jamco,

25  108 F.3d 246, 249 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686 (1974)).

26         In ruling on a motion to dismiss, "[t]he Court's inquiry is whether the allegations state a

27  sufficient claim under Fed.R.Civ.P. 8(a)." Fednav Ltd. v. Sterling International, 572 F. Supp.

28  1268, 1270 (N.D. Cal. 1983).  Rule 8(a) requires only a "short and plain statement of the claim

1   showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  Each and every fact need not be

2   set out in detail; the complaint need only outline the claim for relief.  LaSalvia v. United Dairymen

3   of Arizona, 804 F.2d 1113, 1116 (9th Cir. 1986), cert. denied, 482 U.S. 928 (1987).

4          **B.      No Heightened Standard of Pleading Applies in Antitrust Cases**

5          In Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S.

6   163, 167-68, 113 S. Ct. 1160, 1163 (1993), the Supreme Court made clear that no "'heightened

7   pleading standard'" exists for complex civil cases or any other type of case.  See also United States

8   v. Employing Plasterers' Ass'n, 347 U.S. 186, 189, 74 S. Ct. 452, 454 (1954) ("[W]here a bona fide

9   [antitrust] complaint is filed that charges every element necessary to recover, summary dismissal of

10  a civil case for failure to set out evidential facts can seldom be justified.").  The Ninth Circuit has

11  also consistently held that "notice pleading" principles apply to antitrust cases, which are not to be

12  judged by a higher or different standard than other cases.  Walker Distributing Co. v. Lucky Lager

13  Brewing Co., 323 F.2d 1, 3-4 (9th Cir. 1963); Ernest W. Hahn, Inc. v. Codding, 615 F.2d 830,

14  834-35 (9th Cir. 1980). "[A]ntitrust pleadings need not contain great factual specificity." Portland

15  Retail Druggists Ass'n v. Kaiser Foundation Health Plan, 662 F.2d 641, 648 (9th Cir. 1981), cert.

16  denied, 469 U.S. 1229 (1985).  The antitrust plaintiff "'need only allege sufficient facts from which

17  the court can discern the elements of an injury resulting from an act forbidden by the antitrust

18  laws.'"  Cost Management Services, Inc. v. Washington Natural Gas Co., 99 F.3d 937, 950 (9th

19  Cir. 1996) (quoting Newman v. Universal Pictures, 813 F.2d 1519, 1522 (9th Cir. 1987), cert.

20  denied, 486 U.S. 1059 (1988)).

21         In its papers, IKON derides Newcal for making "conclusory" allegations.  As shown herein,

22  Newcal's allegations are not conclusory but are more than detailed enough to meet the

23  requirements of a notice pleading regime.  More fundamentally, the Ninth Circuit has "specifically

24  rejected the notion that it is necessary to plead 'facts' rather than 'conclusions' in such [antitrust]

25  cases." Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary

26  Workers, 542 F.2d 1076, 1089 (9th Cir. 1976), cert. denied, 430 U.S. 940 (1977).

27         Against this abundance of precedent, IKON cites SmileCare Dental Group v. Delta Dental

28  Plan of California, Inc., 88 F.3d 780, 783 (9th Cir.), cert. denied, 519 U.S. 1028 (1996), but that

1   case is easily distinguished.  In SmileCare, the plaintiffs alleged that the defendant dental insurers'

2   administration of its co-payment requirement was anticompetitive.  The court upheld dismissal of

3   the complaint largely on the grounds that the validity of such co-payment requirements was

4   previously adjudicated in Davidowitz v. Delta Dental Plan of California, Inc., 946 F.2d 1476 (9th

5   Cir. 1991), to be a reasonable means of reducing the cost of dental care.  SmileCare, 88 F.3d at

6   786.  If IKON could point to another case where a court upheld a scheme to restrain trade by

7   knowingly deceiving customers into executing contracts that would preclude them from seeking

8   the services of competitors, IKON might cite SmileCare with some force, but of course no case

9   reaching such an unfair result exists.

10          IKON's reliance upon Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729 (9th Cir.

11   1987), is similarly  misplaced.  Rutman is one in a line of Ninth Circuit cases decided in the 1980s

12   that eventually established the proposition that a terminated distributor could not generally prevail

13   on an antitrust claim against the terminating manufacturer, absent exceptions in particular

14   circumstances that need not be addressed here.  These cases reasoned that, because the terminated

15   distributor would be replaced by a different distributor, there was no effect on competition even

16   though the identity of the competitors changed.  Id. at 734-35. That reasoning is inapplicable here.

17   Newcal was not an IKON distributor.  Rather, it is a competitor of IKON's.  By undertaking the

18   fraudulent conduct alleged in the Complaint to preclude customers from using the services of that

19   competitor, IKON restrained trade to the detriment of competition.

20   **V.      ARGUMENT**

21          **A.      The Complaint Gives IKON Sufficient Notice of Allegations That It Restrained**

22                   **Trade Under Section 1 of the Sherman Act (Claim 1)**

23                   **1.      Market Definition Is a Question of Fact and Thus Not an Issue That**

24                            **May Be Resolved on a Motion to Dismiss**

25          In its motion, IKON did not see fit to bring to the Court's attention the long line of Ninth

26   Circuit precedent establishing that market definition is a question of fact for the jury, not a question

27   of law for the judge.  High Technology Careers v. San Jose Mercury News, 996 F.2d 987, 990 (9th

28   Cir. 1993); Syufy Enterprises v. American Multicinema, Inc., 793 F.2d 990, 994 (9th Cir. 1986),

1 | cert. denied, 479 U.S. 1031 (1987); Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc., 875 F.2d

2 | 1369, 1374 (9th Cir. 1989); Twin City Sportservice, Inc. v. Charles O. Finley & Co., 676 F.2d

3 | 1291, 1299 (9th Cir.) ("The definition of the relevant market is basically a fact question dependent

4 | upon the special characteristics of the industry involved. . . ."), cert. denied, 459 U.S. 1009 (1982);

5 | As a factual question, market definition is particularly ill-suited for resolution on a motion to

6 | dismiss.

7 | ### 2.   Many Cases Have Found a Single-Brand Market

8 | In its papers, IKON contends that it is improper to define a market by the customers of a

9 | single company.  In fact, many cases have found such a definition proper when the facts support it.

10 | The principal case establishing this proposition is Eastman Kodak Co. v. Image Technical

11 | Services, Inc., 504 U.S. 451, 481-82, 112 S. Ct. 2072, 2090 (1992):

12 |
13 |
14 |
15 | > Kodak also contends that, as a matter of law, a single brand of a product or service can never be a relevant market under the Sherman Act.  We disagree.  The relevant market for antitrust purposes is determined by the choices available to Kodak equipment owners. . . . . This Court's prior cases support the proposition that in some instances one brand of a product can constitute a separate market . . . The proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers.

16 | This dictate has been followed afterwards by courts defining the market to constitute the

17 | products or service of a single company.  See, e.g., U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.,

18 | 7 F.3d 986, 997-98 (11th Cir. 1993) (market defined as a single brand of anchors), cert. denied, 512

19 | U.S. 1221 (1994); Nobelpharma Ab v. Implant Innovations, Inc., 930 F. Supp. 1241, 1250 (N.D.

20 | Ill. 1996) (relevant market was single brand of dental implant), aff'd, 141 F.3d 1059 (Fed. Cir.),

21 | cert. denied, 525 U.S. 876 (1998); Hewlett-Packard Co. v. Arch Associates Corp., 908 F. Supp.

22 | 265, 270 (E.D. Pa. 1995) (complaint adequately alleged that relevant market limited to printers

23 | sold by Hewlett-Packard).  Newcal has alleged facts supporting defining the market here in terms

24 | of IKON customers, but the fundamental point is that whether such underlying facts exist is an

25 | issue for discovery and trial, not one that can be decided as a matter of law on the pleadings.

26 | ### 3.   This Case Is Controlled by Eastman Kodak Co. v. Image Technical

27 | ### Services, Inc.

28 | Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 112 S. Ct. 2072

1  (1992), is direct authority for allowing this case to proceed.  In <u>Kodak</u>, a manufacturer of

2  photocopiers and other office equipment both serviced that equipment directly and sold parts to

3  independent service organizations that serviced that equipment for some customers.  In order to

4  eliminate service competition over its customers, Kodak stopped selling parts to customers and

5  independent service providers.  The competing providers brought suit, alleging that Kodak

6  restrained trade under Section One (15 U.S.C. § 1) and monopolized under Section Two of the

7  Sherman Act (15 U.S.C. § 2).  As  stated above, one of Kodak's defenses, paralleling IKON's

8  argument, was that the market could not be defined so narrowly as to include only Kodak

9  equipment, but must also include equipment – such as Xerox's – that competed with Kodak in the

10  initial equipment purchase market.  The court rejected that argument:

11        Because service and parts for Kodak equipment are not interchangeable with other
          manufacturers' service and parts, the relevant market from the Kodak equipment
12        owner's perspective is composed of only those companies that service Kodak
          machines.  <u>See</u> [<u>United States v. E.I. du Pont de Nemours & Co.</u>, 351 U.S. 377, 404
13        (1956)] ('The market is composed of products that have reasonable
          interchangeability').
14
    <u>Kodak</u>, 504 U.S. at 482, 112 S. Ct. at 2090.  In other words, from the perspective of the customer
15
    that had already purchased Kodak equipment, the presence of competitors in the market for initial
16
    equipment purchases was besides the point because those companies did not provide competitive
17
    alternatives to prevent Kodak from exerting market power over customers who had already
18
    purchased Kodak equipment.  Similarly here, that a customer could have chosen to purchase office
19
    equipment initially from a company other than IKON provides no competitive restraint on IKON's
20
    ability to defraud such customers into flex amendments precluding competitors from approaching
21
    the customers.  Indeed, that is the very point of the restraint.  To allow the mere existence of
22
    competitors that the customer can no longer use because of IKON's misconduct to immunize
23
    IKON from the consequences of  that very misconduct would be a perversion of justice.
24
          IKON attempts to distinguish the <u>Kodak</u> case are unavailing.  IKON asserts a matter not set
25
    forth in the Complaint, that IKON does not itself manufacture equipment or parts, but nothing
26
    turns on that assertion.  Even if, like many other companies in today's economy, IKON gets all the
27
    products it markets from other companies, that fact does not dilute IKON's market power over its
28

1   customers one whit.  Once those customers have been defrauded into a flex agreement, they have

2   no choice but to use IKON for office, equipment, parts and service.  That is the market power at

3   issue.  To make the applicability of the <u>Kodak</u> doctrine turn on whether the defendant

4   manufactures its own goods or has outsourced that function would be to elevate form over

5   "commercial realities" (<u>Kodak</u>, 504 U.S. at 482, 112 S. Ct. at 2090) in direct contravention of

6   <u>Kodak</u>'s direction to lower courts.

7        The affinity between <u>Kodak</u> and this case is also evident from an unsuccessful argument

8   advanced by the defendant in that case.  The defendant argued that competition in the equipment

9   market limited its ability to exploit customers because any exploited customer would simply turn

10  to another equipment manufacturer.  The Supreme Court's opinion identified two potential facts

11  that could defeat the defendant's argument.  <u>Kodak</u>, 504 U.S. at 472-77, 112 S. Ct. at 2085-87; <u>see</u>

12  <u>also</u> <u>Virtual Maintenance, Inc. v. Prime Computer, Inc.</u>, 11 F.3d 660, 664-66 (6th Cir. 1993), <u>cert</u>.

13  <u>dismissed</u>, 512 U.S. 1216 (1994).  First, the costs of switching equipment could refute the

14  defendant's assumption that customers are indifferent between retaining their equipment versus

15  switching to new equipment to evade service exploitation.  <u>Id.</u>  Newcal has alleged that IKON's

16  misconduct has similarly raised switching costs to levels so high that the customer cannot respond

17  to exploitation by replacing its equipment.  (Complaint ¶¶ 31-32, 45-51.)  Second, information

18  shortfalls could refute the defendant's assumption that customers compare accurately the cost of

19  buying and servicing equipment over its expected lifetime before purchasing equipment.  Newcal

20  has also alleged that customers are unaware of the impact of the flex amendments when they

21  originally purchase equipment, and even when they signed the amendments, and thus cannot factor

22  the impact of flex amendments into their decision as to which initial equipment vendor to

23  patronize.  (<u>Id.</u>)

24       Finally, the Supreme Court in <u>Kodak</u> did not foreclose the plaintiffs from presenting other

25  evidence on the question.  In other words, the plaintiffs can provide evidence showing that

26  competition in the market for initial equipment purchases does not prevent the defendant

27  restraining competition in a downstream market.  In this case, Newcal has alleged that IKON has

28  generated excess rates of return and profit in its operation in the market at issue.  (Complaint ¶¶ 5,

1   49, 63.)  Such excess returns are evidence of market power and, at the level alleged here,

2   monopoly power.  See generally 2A Phillip E. Areeda et al., Antitrust Law ¶ 516 (2d ed.

3   2002)(market and monopoly power may be inferred from defendants' rates of return).

4          In sum, the difference between this case and Kodak is merely one of detail in the method

5   the defendant used to insulate itself from having to compete over its existing customer base.  In

6   Kodak, the defendant  froze out competitors by choking off their supply of replacement parts.  In

7   this case, defendant froze out competitors by defrauding customers into signing amendments

8   making it impossible for the customer to patronize a competitor.  But in each case, the fundamental

9   fact remains that the defendant was using methods other than lower prices or superior products to

10  prevent competitors from servicing defendant's customer base.[1]  Consequently, the same result as

11  attained in Kodak should attain here; the case should be allowed to proceed to discovery and,

12  ultimately, trial.

13              **4.      The "Contract Power" Cases Relied Upon by IKON Are Inapposite**

14                      **Where, as Here, Unrestrained Competition Could Not Take Place**

15                      **Before the Formation of the Contract and Where the Misconduct Was**

16                      **Designed to Thwart Such Competition**

17          IKON cites two cases for the proposition that "contract power" cannot be confused with

18  "market power":  Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir.

19  1997), cert. denied, 523 U.S. 1059 (1998), and Maris  Distributing Co. v. Anheuser-Busch, Inc.,

20  302 F.3d 1207, 1221 (11th Cir. 2002), cert. denied, 537 U.S. 1190 (2003).  But the reasoning of

21  those cases demonstrates why they do not apply here.  For example, in Queen's City Pizza, the

22  plaintiffs were Domino's Pizza franchisees that sought to define the market as those items

23

24          [1] No doubt IKON, in its reply, will maintain that Kodak merely concerned market power in
    equipment markets and not "contract power."  This stance is incorrect on two scores.  First, the
25  Supreme Court proceeded on the basis that Kodak had no market power in the equipment market
    where it sold against other manufacturers.  504 U.S. at 465 & n.10, 112 S.Ct. at 2081 & n. 10.
26  Second, the Supreme  Court reached the conclusions it did about defining the markets and
    determining Kodak's power in those markets by reference to Kodak's contracts with parts
27  manufacturers not to sell to plaintiffs and Kodak's contracts with customers not to purchase service
    from plaintiffs.  504 U.S. at 459, 112 S.Ct. at 2078 (agreements with parts manufacturers); Id. & 504
28  U.S. at 463 & n. 8, 112 S.Ct. at 2080 & n. 8.

1   Domino's Pizza required that franchisees purchase from the franchisor as part of the allegation that

2   Domino's Pizza restrained trade and monopolized that market by charging supracompetitive

3   prices.  The court ruled against the plaintiffs and reasoned that it would be a mistake to focus on

4   the parties' market power <u>after</u> the contract (a franchise agreement) was signed.  The court

5   emphasized that competition occurred <u>before</u> the contract was signed when the plaintiffs could

6   have chosen among the many franchisors that compete with Domino's Pizza "such as McDonald's

7   or Kentucky Fried Chicken."  <u>Queen City Pizza, Inc. v. Domino's Pizza, Inc.</u>, 922 F. Supp. 1055,

8   1061-62 (E.D. Pa. 1996).  The competition that took place at that stage in the process disciplined

9   the successful franchisor's ability to exploit any subsequent market power.  <u>Queen City Pizza</u>, 124

10  F.3d at 440-41.   In other words, so long as unrestrained competition occurred before a contractual

11  relationship was formed, any subsequent developments concerned only the parties to the contract,

12  but not competition generally.[2]  <u>See</u> <u>Collins v. International Dairy Queen, Inc.</u>, 980 F. Supp. 1252,

13  1259 (M.D. Ga. 1997) (<u>Queen City Pizza's</u> distinction between contract power and market power

14  did not apply to situation where franchisor enforced contract in ways that could not be reasonably

15  foreseen before contract was executed to exploit its power over franchisee).

16       Also worth noting is the fact that the contract power cases upon which IKON primarily

17  relies are franchise cases where the francisee is attempting to use the antitrust laws to get out from

18  under the burdens of the franchise agreement it signed.  In such circumstances, some courts have

19  understandably directed plaintiffs to their remedies under contract law.  In the instant case, by

20  contrast, IKON's competitors, who do not enjoy the benefit of traditional contract remedies here,

21  are attacking the use of contracts among third parties to restrain trade.  As is evident from the

22  following sections on exclusive dealing and tying, companies have employed the antitrust laws to

23  attack the trade restraints resulting from a competitor's contracts with customers for decades

24       In the present case, however, IKON is alleged to have procured the contracts at issue – the

25  flex agreements – by fraud.  It is specifically alleged, and overwhelming evidence will support, that

26  the customers had no idea that the flex agreements they signed purported to extend the terms of

27  _____

28       [2]   <u>Maris Distributing</u>, 302 F.3d at 1224 (essentially adopted <u>Queen City Pizza</u>'s reasoning).

1    previously acquired equipment and increase the buyout charge so that they could not afford to seek

2    competitive alternatives to IKON.  Many of those customers that discovered after the fact what the

3    flex agreements provided have been foreclosed from seeking competitive alternatives to IKON

4    because they have concluded that the legal cost of challenging the agreements exceeded any

5    possible savings that would result.  Consequently, IKON cannot seek protection from the "contract

6    power" line of cases because this is not a case where there was unrestrained competition before the

7    flex agreements were signed.  Rather, IKON defrauded customers into signing the flex agreements

8    for the purpose and with the effect of foreclosing the customers from competitors.[3]

9            **B.      The Complaint Gives IKON Sufficient Notice of Allegations of Exclusive**

10                           **Dealing (Claim 2)**

11           IKON contends that Newcal's Section One exclusive dealing claim fails for the same

12   reasons that their conspiracy claim fails; namely, because plaintiffs cannot properly define the

13   relevant market as IKON's own customer base.  For the reasons discussed immediately above, this

14   argument should be rejected.

15           IKON also argues that plaintiffs' exclusive dealing claim fails because Newcal has not

16   pointed to any language in the contracts between IKON and its customers requiring exclusivity.

17   But IKON's literalistic definition of exclusive dealing is too restrictive to accord with the caselaw.

18   A number of courts have recognized the concept of *de facto* exclusive dealing, in which a

19   contractual arrangement that does not expressly require one party to deal exclusively with another

20   may nonetheless be deemed an exclusive dealing arrangement for Section One purposes.  For

21   instance, in LePage's Inc. v. 3M, 324 F.3d 141 (3d Cir. 2003) (en banc), cert. denied, 124 S. Ct.

22   2932 (2004), 3M had a bundled rebate program requiring retailers to purchase a wide variety of 3M

23   products to obtain a discount on Scotch tape.  A retailer that purchased Scotch tape without

24   purchasing the other 3M products did not receive the rebate.  There was no explicit exclusive

25           ───────────────────

26           [3]   This reasoning finds further support in the line of cases that apply Kodak only when
     customers did not know about the policy at issue before their purchase.  See, e.g., Digital Equipment
27   Corp. v. Uniq Digital Technologies, Inc., 73 F.3d 756, 763 (7th Cir. 1996).  In this case, it is alleged
     that the customers did not know about the flex agreements and the restrictions it imposed on their
28   competitive alternative.  Accordingly, even under this rather restrictive interpretation of Kodak, the
     instant case should be allowed to proceed on a Kodak theory.

1  dealing provision in the documents, but as a practical matter none of 3M's retailer customers

2  would carry competing products for fear of losing the discount.  The Court of Appeals affirmed the

3  jury's exclusive dealing verdict, holding that the bundled rebate program amounted to an exclusive

4  dealing claim in substance if not in form.  Various other courts have also recognized the *de facto*

5  exclusive dealing doctrine.  <u>See</u>, <u>e.g.</u>, <u>Concord Boat Corp. v. Brunswick Corp.</u>, 207 F.3d 1039 (8th

6  Cir.), <u>cert</u>. <u>denied</u>, 531 U.S. 979 (2000); <u>see generally</u> 11 Areeda, <u>Antitrust Law</u> ¶ 1807b (2d ed.

7  2005) (the antitrust laws condemn "not only express exclusive-dealing contracts but also contracts

8  that have the 'practical effect' of inducing exclusive dealing.")  In the instant case, IKON's

9  customers signed requirements contracts under which they would purchase all equipment,

10  maintenance, service, parts, and supplies from IKON for a set period of time.  Plaintiffs have

11  alleged that it is economically impracticable for a customer to replace this equipment.  (Complaint

12  ¶¶ 36-37.)  Plaintiffs are essentially trapped in their relationship with IKON and cannot do business

13  with competitors even if they are able to offer more favorable specific terms. This arrangement

14  satisfies the "exclusivity" requirement of plaintiffs' exclusive dealing claim.

15       The authorities cited by IKON, such as <u>Western Parcel Express v. United Parcel Service</u>,

16  190 F.3d 974 (9th Cir. 1999), are inapposite.  In <u>Western Express</u>, the contracts were readily

17  terminable and did not prohibit the customers from doing business with other service providers; a

18  company could send some packages via UPS and others via Federal Express, for example.  <u>Id.</u> at

19  976; <u>see</u> <u>JM Computer Services, Inc. v. Schlumberger Technologies, Inc.</u>, 1997-2 Trade Cas.

20  (CCH) ¶ 72,024, at 81,087 (N.D. Cal. May 3, 1996), is also not on point because the allegations in

21  that case were so conclusory as to be meaningless; the plaintiff had provided no details about any

22  agreement with any person or entity.

23       **C.     The Complaint Gives IKON Sufficient Notice of Allegations of a Section One**

24       **Tying Claim (Claims 3 & 4)**

25       IKON's argument with respect to plaintiffs' tying claim is based upon exactly the same

26  flawed premise that underlies its argument vis-a-vis the restraint of trade claim; namely, that IKON

27  cannot, as a matter of law, have market power over a market defined as its own customer base. For

28  the reasons discussed in Section A, <u>supra</u>, IKON is incorrect.

In addition, it is important to note that Kodak was itself a tying case, and that the Supreme Court expressly held that Kodak had market power in the tying market. 504 U.S. at 465, 112 S. Ct. at 2081. Also, a number of post-Kodak authorities have held that the tying market may, in fact, be defined as the defendant's own customer base. See, e.g., Systemcare, Inc. v. Wang Laboratories Corp., 117 F.3d 1137 (10th Cir. 1997); Datagate, Inc. v. Hewlett-Packard Co., 60 F.3d 1421 (9th Cir. 1995), cert. denied, 517 U.S. 1115 (1996).

### D.    The Complaint Gives IKON Sufficient Notice of Allegations of Monopolization and Attempt to Monopolize (Claims 5 & 6)

IKON's attack on Newcal's monopolization and attempt to monopolize claims stands or falls on the same market analysis Newcal refuted above. IKON introduces one new argument with respect to these claims, however, when it attacks the sufficiency of Newcal's allegations of barriers to entering the relevant market. IKON acknowledges that Newcal alleged barriers to entry (Memo. at 15) but tries to create a new rule of law when it states that the barriers must consist of something other than defendants' misconduct.

The only authority asserted by IKON for this novel proposition is Los Angeles Land Co. v. Brunswick Corp., 6 F.3d 1422 (9th Cir. 1993), cert. denied, 510 U.S. 1197 (1994). But the allegations in that case simply involved defendant's misconduct toward the single plaintiff and its principal concerning one discrete real estate transaction. Id. at 1427. Nothing in those allegations spoke to entry barriers for other competitors generally. By contrast, the allegations in this case involve illegal contractual amendments that foreclose any competitor, not just plaintiffs in this case, from approaching those customers (Complaint ¶¶ 32, 43-51) as well as other barriers arising from the nature of the industry (id. ¶ 31). IKON has cited no case holding that defendants' misconduct cannot constitute a barrier to entry when in fact it serves to preclude competition from all competitors, not merely one plaintiff before the court.[4]

_____

[4] In a footnote at the end of its argument concerning the monopolization claims, IKON attempts to argue that Newcal's declaratory relief claim should be dismissed as well. IKON largely incorporates by reference the argument on this point in GE Capital's motion to dismiss. To avoid burdening the court with repetition, Newcal shall also incorporate by reference its opposition to that motion, rather than repeating the points raised therein at this point.

**E.    Plaintiffs Need Not Prove Market Power to State an Antitrust Claim**

IKON's chief contentions with respect to all of plaintiffs antitrust claims is that plaintiffs have improperly defined the relevant market, and for this reason their antitrust claims are untenable.  IKON is mistaken.  A number of courts have noted that "defining the market is not the aim of antitrust law; it merely aids the search for competitive injury…Because market definition and market power are merely tools designed to uncover competitive harm, proof of 'actual detrimental effects, such as a reduction of output, can obviate the need . . . [for] elaborate market analysis.'…Given that the ability to raise price and to exclude competition are hallmarks of market power, the finding of actual harm to competition suffices under Sherman Act § 1 even in the absence of extended market analysis." Oltz v. Saint Peter's Community Hospital, 861 F.2d 1440 (9th Cir. 1988);  Flash Electronics v. Universal Music, 312 F. Supp. 2d 379 (E.D.N.Y. 2004). Therefore, even if plaintiffs' market definition is somehow flawed, the case can still proceed if plaintiffs have alleged an actual harm to competition.  Further, whether a particular act is actually harmful to competition is a question of fact for the jury.  Ortiz, supra, 861 F.2d at 1448.  Plaintiffs have alleged a number of acts that constitute actual harm to competition (See, e.g. Complaint ¶¶ 57-60, 62, 67, 79, 84, 89, 91, 94, 95; Hennefer Decl. ¶), and for this reason, their monopolization claim should be allowed to go forward.

**F.    The Complaint Gives IKON Sufficient Notice of Allegations of a Lanham Act Violation (Claim 7)**

IKON next argues that plaintiffs' Lanham Act claim is barred because all of the misrepresentations of fact at issue herein amount to nothing more than unactionable "puffing."  For two reasons, this contention is without merit.

First, IKON's argument is factually misleading because it has cherry-picked certain allegations from the Complaint while completely ignoring others.  In its motion papers, IKON argues that statements such as "flexibility to meet customer needs" (Complaint ¶ 40(a)) and "designed to meet the needs of the customer" are so vague and amorphous as to amount to nothing more than "puffing."  With respect to those particular statements, IKON may well be correct. However, IKON simply ignores plaintiffs' allegation that the representation that the customer

1  would "fully amortize the equipment cost except for a small fair market residual" over the 60

2  month term of the contract was false and misleading.  This misrepresentation cannot fairly be

3  deemed puffery.

4          "Puffery is 'exaggerated advertising, blustering, and boasting upon which no reasonable

5  buyer would rely. . . .'" United Industries Corp. v. Clorox Co., 140 F.3d 1175, 1180 (8th Cir. 1998)

6  (citation omitted).  The authorities cited by IKON, such as Cook, Perkiss & Liehe, Inc. v. Northern

7  California Collection Service, Inc., 911 F.2d 242, 243 (9th Cir. 1990) (per curiam) ("the low cost

8  commercial collection experts"), and Atari Corp. v. 3DO Co., No. C 94-20298, 1994 WL 723601,

9  at *1 (N.D. Cal. May 16, 1994) ("the most advanced home gaming system in the universe"), are all

10 premised upon vague and amorphous statements.

11         However, "'[a] specific and measurable advertisement claim . . . is not puffery.'" 4 J.

12 Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27:38, at 27-67 (4th ed.

13 2004) (citation omitted).  If a statement may be quantified, it is not puffing.  See Clorox Co. Puerto

14 Rico v. Proctor & Gamble Commercial Co., 228 F.3d 24, 28 (1st Cir. 2000) (bleach – "Whiter is

15 not possible"); Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1138 (9th Cir. 1997)

16 (slower growing grass).  In the instant case,  plaintiffs allege that while IKON represented that the

17 equipment purchased by its customers would be "fully amortized" except for a "small fair market

18 residual value," and that the industry standard fair market residual value was 10% of the original

19 purchase price of the equipment.   IKON, however, demanded a 35% residual value.  There is

20 nothing vague and amorphous about the difference between 10% and 35%; it is easily quantified

21 and can be measured against an objective standard.  It certainly is not the sort of commercial

22 braggadocio such as the "most advanced gaming system in the universe" that the authorities relied

23 upon by IKON discuss.

24         **G.     The Complaint Gives IKON Sufficient Notice of Allegations of a RICO**

25              **Violation (Claim 8)**

26         IKON makes three arguments to dismiss Newcal's RICO claim, none of which is

27 well taken.  First, IKON argues that antitrust violations in and of themselves cannot serve as the

28 predicate for a RICO violation.  This point is true as far as it goes, but besides the point.  The

1   Complaint alleges that conduct which violates the antitrust laws – for example, defrauding

2   customers into flex agreements – also constitutes mail and wire fraud, predicate acts for RICO

3   liability.  IKON cites no case, because there is none, which states that acts of mail and wire fraud

4   cannot serve as predicate acts for RICO liability merely because they also play a part in the

5   violation of other laws.

6          Second, IKON argues that the Complaint fails to meet a heightened requirement of

7   pleading mail and wire fraud with specificity.  The Ninth Circuit authority IKON cites for that

8   proposition, Alan Neuman Productions, Inc. v. Albright, 862 F.2d 1388, 1392-93 (9th Cir. 1988),

9   cert. denied, 493 U.S. 858 (1989), is easily distinguishable from the instant case.  Alan Neuman

10  concerned a default judgment, and the court emphasized that technical compliance with pleading

11  rules must be enforced strictly when a default judgment issues, a situation markedly different from

12  a contested case where discovery and subsequent motions will clarify issues and factual disputes.

13  Moreover, the allegations in Alan Neuman did not describe the contents of the fraudulent

14  communications nor specify who were the innocent recipients of those communications.  Id. at

15  1393.  By contrast, the allegations here describe the identity of the recipient of the

16  communications, the nature of the fraudulent communication and the range in time when they

17  occurred.  (Complaint ¶¶ 52-53, 109.)  See Wisdom v. First Midwest Bank, 167 F.3d 402, 406-07

18  (8th Cir. 1999)(complaint alleging fraudulent scheme need not plead false representation in a

19  particular piece of correspondence).

20         Further, Alan Neuman and the other Ninth Circuit case applying it, Edwards v. Marin Park,

21  Inc., 356 F.3d 1058, 1065-66 (9th Cir. 2004), featured fraudulent communications made directly to

22  the plaintiff.  In those circumstances, the burden of requiring specificity from the plaintiff is

23  relatively minor.  In this case, by contrast, the fraudulent communications were made to IKON

24  customers, not plaintiffs.  In those circumstances, courts have relaxed the demand for specificity on

25  the common sense ground that one who is not a party to a communication should not be expected

26  to have highly specific knowledge about it prior to discovery.  See, e.g., Schiffels v. Kemper

27  Financial Services, Inc., 978 F.2d 344, 353 (7th Cir. 1992); Volmar Distributors, Inc. v. New York

28  Post Co., 825 F. Supp. 1153, 1162 (S.D.N.Y. 1993); Giuliano v. Everything Yogurt, Inc., 819 F.

1    Supp. 240, 244-45 (E.D.N.Y. 1993). Lastly, in the Declaration of James A. Hennefer and Offer of

2    Proof, submitted herewith, Newcal provides more detail about the specific instances of mail and

3    wire fraud alleged.

4         IKON also contends that specificity must be required for each instance of mail and wire

5    fraud that occurred, rather than just those that are alleged, citing to <u>Alan Neuman</u>. (Memo. at 19.)

6    <u>Alan Neuman</u> does not so state. More fundamentally, although requiring a high degree of

7    specificity for each instance of mail and wire fraud communicated to the plaintiff itself when there

8    are relatively few such communications might be justified, no purpose would be served in

9    imposing it where, as here, tens of thousands – or more – such communications took place to

10   which plaintiffs were not party.

11        Finally, IKON attempts to shift subtly the law of standing for RICO by arguing that Newcal

12   did not allege its own reliance on IKON's fraudulent communications. (Memo at 20.) Not all

13   courts agree that reliance is an element of a RICO claim based on mail and wire fraud. <u>See, e.g.,</u>

14   <u>Systems Management, Inc. v. Loiselle</u>, 303 F.3d 100, 104 (1st Cir. 2002). Moreover, plaintiffs are

15   entitled to assert RICO claims arising from mail or wire fraud perpetrated by defendants against a

16   third party. <u>See</u>, <u>e.g.</u>, <u>Freeport Transit, Inc. v. McNulty</u>, 239 F. Supp. 2d 102 (D. Me. 2003); <u>Pine</u>

17   <u>Ridge Recycling, Inc.v. Butts County</u>, 855 F. Supp. 1264 (M.D. Ga. 1994). Obviously, if IKON

18   were correct that a plaintiff needed to allege its own reliance on fraudulent communications to

19   assert a RICO claim, standing would be limited to the plaintiffs that were parties to the

20   communications. That IKON does not contend directly that standing is so limited is quite

21   revealing.

22        **H.    The Complaint Gives IKON Sufficient Notice of Allegations of Intentional**

23   **Interference with Prospective Economic Advantage (Claim 10)**

24        IKON also argues that plaintiffs have failed to state a claim for intentional interference with

25   prospective economic advantage because they did not allege any "established, actual relationships

26   with IKON customers." (Memo. at 21:7-8.) IKON is trying to set the bar too high. Plaintiffs need

27   not have "established, actual relationships" in order to state a claim for intentional interference, but

28   only a "reasonable probability" that such a relationship would have been consummated but for

1    defendant's wrongful acts.  See 5 B. E. Witkin, Summary of California Law § 664 (9th ed. 1988).

2           California law is in accord and recognizes that the expectancy of a relationship is a legally

3    protectable interest.  See, e.g., Zimmerman v. Bank of America National Trust & Savings Ass'n,

4    191 Cal. App. 2d 55, 57 (1961);  Friedman v. Jackson, 266 Cal. App. 2d 517 (1968).

5           Here Newcal has alleged that "[p]laintiffs had valid business relationships and definite and

6    specific prospective advantage and expectancy with IKON customers who had been flexed on

7    IKON contracts.  There was a reasonable probability of these business relationships of plaintiffs

8    maturing into future economic benefits to plaintiffs."  (Complaint ¶ 120.)  This allegation is more

9    than adequate to satisfy the federal standard of notice pleading.  Swierkiewicz v. Sorema N. A.,

10   534 U.S. 506, 512, 122 S. Ct. 992, 998 (2002).  While the Complaint does not set forth the

11   particulars of every sales call with every customer, as such an approach would render the document

12   needlessly prolix, it is nonetheless readily apparent from the face of the pleadings that because the

13   plaintiffs and IKON are competitors that provide the same services, and compete over the same

14   customers, that IKON's wrongful acts intended to prohibit its customers from terminating their

15   service agreements are intended to adversely affect plaintiffs.

16          All of the cases cited by defendants are inapposite because they fail to recognize the

17   "reasonable probability" standard established by the above authorities.  For instance, in Westside

18   Center Associates v. Safeway Stores 23, Inc., 42 Cal. App. 4th 507 (1996), the plaintiff was unable

19   to demonstrate that it had any possibility of a relationship with any specific buyer because the court

20   prohibited it from introducing certain evidence, so the plaintiff instead turned to a novel

21   "interference with the market" theory which the court rejected as too speculative.  In Silicon

22   Knights, Inc. v. Crystal Dynamics, Inc., 983 F. Supp. 1303 (N.D. Cal. 1997), the plaintiff was an

23   infant, poorly funded technology start-up company that had no customer base at all, and therefore

24   was unable to prove that the defendant had interfered with any future expectancy.  Here, plaintiffs

25   are established copier repair firms with well-documented financial histories and customer bases,

26   not untested start-ups.

27          Lastly, and significantly, it should be pointed out that the question of whether the plaintiff

28   had a "reasonable probability" of an advantageous economic relationship is one of fact.  Indeed, a

1  California pattern jury instruction on that issue has been promulgated.  BAJI 7.82; CACI 2202.

2  IKON's motion to dismiss is therefore ill-founded because it seeks resolution of this factual issue

3  as a matter of law.

4

5

6      **I.**    **The Complaint Gives IKON Sufficient Notice of Allegations of Violation of**

7      **Cal. Bus. & Prof. Code §§ 17200 and 17500  (Claims 11 & 12)**

8      **1.**    **Newcal's § 17200 Claim Satisfies the Article III Standing Requirement**

9      The last issue raised by the Motion to Dismiss, Newcal's standing to assert a Bus. & Prof.

10  Code § 17200 claim, contains a major and outrageous misrepresentation of fact.  IKON argues that

11  the § 17200 claim should be dismissed because plaintiffs fail to meet the Article III standing

12  requirement of individual injury because they bring this action on behalf of California consumers,

13  rather than in their own right as competitors:

14      [P]laintiffs do not assert their rights as competitors.  They purport to act solely on
    behalf of California consumers and seek remedies only for alleged injuries to these
15      consumers.

16   (Memo. at 22:16-18.)

17      Defendants then cite ¶¶ 135 and 145 of the Complaint as purported support for their

18  position.  But defendants' contention ignores the plain language of those allegations:

19      The remedies sought herein…are sought on behalf of flexed IKON Contract
    customers of IKON and IOS Capital in California, and IKON and IOS Capital
20      *competitors* in California and *the general public*.

21  Id. (emphasis added).  These allegations flatly and conclusively contradicts defendants' contention

22  that "plaintiffs do not assert their rights as competitors."

23      As competitors of IKON, plaintiffs clearly have standing to bring a § 17200 claim.  See

24  Cal. Bus. & Prof. Code § 17204; Committee on Children's Television, Inc. v. General Foods

25  Corp., 35 Cal. 3d 197 (1983) (competitors have standing to sue under § 17200); Southwest Marine,

26  Inc. v. Triple A Machine Shop, Inc., 720 F. Supp. 805, 808 (N.D. Cal. 1989) (same).  They also

27  have standing to assert a § 17500 claim.  Commitee on Children's Television, 35 Cal. 3d at 210

28  ("[a]ny violation of [ § 17500]. . .necessarily violates the unfair competition law").  The authorities

1   cited by defendants are therefore inapposite because they involve cases in which some unrelated

2   party claims to bring an action solely on behalf of consumers, and not on its own behalf.  As shown

3   above, this case is brought on behalf of both the plaintiff competitors and consumers, and plaintiffs

4   therefore have Article III standing to assert it, since not even IKON has the temerity to suggest that

5   a suit by a competitor against a competitor for unfair competition fails to satisfy Article III

6   requirements.

7        IKON next contends that the instant proceeding cannot go forward as a representative

8   action because it has been brought on behalf of California consumers.  IKON therefore reasons that

9   the factual circumstances of each consumer will differ and require individualized proof.  But as

10  was shown above, this is not a representative action  brought by lawyers on behalf of the general

11  public.  Plaintiffs are IKON's competitors, and as such are directly affected by its unlawful acts.

12  Therefore, they are entitled to bring this case in their individual capacity and on their own behalf.

13  While the injunctive relief plaintiffs seek is a general prohibition of IKON's unlawful sales

14  practices, and it will, if granted, extend to IKON's dealings with all California competitors and

15  consumers, this is an individual action and will be prosecuted as such.

16              **2.    The Complaint Gives IKON Sufficient Notice of Allegations of**

17                   **Violations of § 17200**

18              **a.    Plaintiffs' § 17200 Claim Is Not Dependent on Their Sherman**

19                   **Act Claims**

20        IKON contends that, because Newcal's antitrust claims fail, its § 17200 claim must

21  likewise be dismissed.  This contention overlooks the governing legal standard set forth in Cel-

22  Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal. 4th 163 (1999).  In

23  Cel-Tech, the California Supreme Court described the purpose and scope of § 17200, and

24  expressly noted that a party may state a claim for a violation of § 17200 without also stating a

25  claim for a violation of another law:

26        The statutory language referring to 'any unlawful, unfair *or* fraudulent' practice
          (italics added) makes clear that a practice may be deemed unfair *even if not*
27        *specifically proscribed by some other law*.

28  Id. at 180 (emphasis added).  Noting that both § 17200 and the antitrust laws were enacted to

advance the same public policy goals, the California Supreme Court then carefully outlined the

nexus between the antitrust laws and § 17200:

> When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.

Id. at 187.

The Supreme Court's Cel-Tech standard is quite clear. Plaintiffs do not need to allege a

violation of the antitrust laws in order to state an antitrust claim in order to bring a § 17200 action.

They need only allege a course of conduct that "violates the policy or spirit of one of those

[antitrust] laws because its effects are comparable to or the same as a violation of the law, or

otherwise significantly threatens or harms competition." Id. This is precisely what Newcal has

alleged here. Even if these antitrust claims fail, there can be no doubt that IKON's actions severely

curtail competition and reduce consumer choice.

The principal case cited by IKON in support of its contrary position, Chavez v. Whirlpool

Corp., 93 Cal. App. 4th 363 (2001), actually undercuts IKON's own argument. The Chavez court

agreed that one need not establish a violation of the antitrust laws in order to state a § 17200 claim:

> We do not hold that in all circumstances an 'unfair' business act or practice must violate an antitrust law to be actionable under the unfair competition law.

Id. at 375.

The relationship between the antitrust and unfair competition laws may be best described in

the following manner. If an act is prohibited by the antitrust laws, it is also prohibited by the unfair

competition law ("UCL"), because § 17200 prohibits, among others, all "unlawful" practices that

injure competition. If, by contrast, an act is permitted by the antitrust laws – i.e., the courts or a

legislature have examined a particular act and have decided that it is beneficial to competition –

then it is not actionable under the UCL. This is what the Chavez case teaches. In Chavez, the

plaintiff complained that the defendant's monitoring of a suggested retail price maintenance

agreement violated the antitrust laws and the UCL. The Court of Appeal held that the antitrust

laws protect, rather than prohibit, such policies, because by monitoring its dealers' compliance

1   with its price schedule, the manufacturer could ensure that rival dealers could not use unsupported

2   accusations of deviations from the schedule as a competitive weapon. 93 Cal. App. 4th at 373.

3   Therefore, under <u>Chavez</u>, if an act is protected by the antitrust laws as procompetitive – i.e., the

4   courts have examined the behavior or policy at issue and have specifically decided that it is

5   beneficial to competition –  it is not actionable under the UCL.  If, however, the antitrust laws are

6   silent on the question of whether a particular act is pro- or anti-competitive, then the act may

7   violate the UCL if it is "unfair."

8           As the California Supreme Court has noted:

9               The unfair competition law, which has lesser sanctions than the Unfair
        Practices Act, has a broader scope for a reason.  '[T]he Legislature. . . intended by
10      this sweeping language to permit tribunals to enjoin on-going wrongful business
        conduct in whatever context such activity might occur. Indeed,. . .the section was
11      intentionally framed in its broad, sweeping language, precisely to enable judicial
        tribunals to deal with the innumerable "new schemes which the fertility of man's
12      invention would contrive."'. . .'When a scheme is evolved which on its face violates
        the fundamental rules of honesty and fair dealing, a court of equity is not impotent
13      to frustrate its consummation because the scheme is an original one. . . .'

14   <u>Cel-Tech</u>, 20 Cal. 4th at 181 (citing <u>American Philatelic Society v. Claibourne</u>, 3 Cal. 2d 689, 698

15   (1935)).  It is therefore clear that even if Newcal's antitrust claims are somehow defective, Newcal

16   may still proceed on its claim for a violation of § 17200.

17               **3.   IKON's Contracts Are Actionable Under § 17200**

18           Finally, IKON claims that § 17200 may not be used to determine the fairness of contracts,

19   and because the bulk of plaintiffs' claims implicate IKON's contracts, this Court may not review

20   them under § 17200.  The authorities cited by IKON, <u>California Medical Ass'n, Inc. v. Aetna U.S.</u>

21   <u>Healthcare of California, Inc.</u>, 94 Cal. App. 4th 151, 169-70 (2001), and <u>Samura v. Kaiser</u>

22   <u>Foundation Health Plan, Inc.</u>, 17 Cal. App. 4th 1284, 1299 n.6 (1993), <u>cert</u>. <u>denied</u>, 511 U.S. 1084

23   (1994), do indeed state that § 17200 "does not give the courts a general license to review the

24   fairness of contracts."  But IKON has taken this single sentence of dicta and blown it all out of

25   proportion.  Of course § 17200 may be used to strike down unfair contracts.  The <u>California</u>

26   <u>Medical Ass'n</u> and <u>Samura</u> cases merely restate the general maxim that courts will not interfere

27   with a bargained-for, arms' length transaction and impose their own views of fairness on the

28   parties. They do not stand for the proposition that any unfair, unlawful, or fraudulent practice that

1    is reduced to writing in a contract is beyond the reach of § 17200. A number of contracts have been

2    found to violate § 17200.  For instance, in <u>State Farm Fire & Casualty Co. v. Superior Court</u>, 45

3    Cal. App. 4th 1093 (1996), clauses in standard form insurance contracts were found to violate the

4    UCL.  <u>See</u> <u>also</u> <u>Allied Grape Growers v. Bronco Wine Co.</u>, 203 Cal. App. 3d 432, 449-53 (1988)

5    (contract to sell agricultural goods violated § 17200); <u>Bondanza v. Peninsula Hospital & Medical</u>

6    <u>Center</u>, 23 Cal. 3d 260, 266-67 (1979) (provision in collection agency contract violated UCL).

7    **VI.     IF ANY PORTION OF THE COMPLAINT IS DEEMED DEFICIENT, LEAVE TO**

8    **FILE AN AMENDED COMPLAINT SHOULD BE GRANTED**

9            As shown above, the motion to dismiss should be denied.  If the Court disagrees, however,

10   Newcal requests leave to amend the Complaint to cure any infirmities.

11           As a general matter, if a complaint is dismissed for failure to state a claim, leave to amend

12   should be freely granted unless it is determined that no possible amendment would cure the

13   complaint's deficiencies.  <u>See</u> <u>Reddy v. Litton Industries, Inc.</u>, 912 F.2d 291, 296 (9th Cir. 1990),

14   <u>cert</u>. <u>denied</u>, 502 U.S. 921 (1991).  A denial of leave to amend is reviewed for abuse of discretion,

15   "'but such denial is "strictly" reviewed in light of the strong policy permitting amendment.'"

16   <u>Moore v. Kayport Package Express, Inc.</u>, 885 F.2d 531, 537 (9th Cir. 1989) (citation omitted); <u>see</u>

17   <u>also</u> <u>DCD Programs, Ltd. v. Leighton</u>, 833 F.2d 183, 190 (9th Cir. 1987) (Ninth Circuit reversed

18   district court's denial of plaintiff's motion for leave to file a fourth amended complaint).  Fed. R.

19   Civ. P. 15(a) provides that "leave shall be freely given when justice so requires."

20           In exercising that discretion, a district court must be guided by the underlying purpose of

21   Fed. R. Civ. P. 15, which is "to facilitate decision on the merits, rather than on the pleadings or

22   technicalities." <u>United States v. Webb</u>, 655 F.2d 977, 979 (9th Cir. 1981).  Indeed, "Rule 15's

23   policy of favoring amendments to pleadings should be applied with 'extreme liberality.'" <u>Id.</u>;

24   <u>Rosenberg Bros. & Co. v. Arnold</u>, 283 F.2d 406 (9th Cir. 1960) (per curiam).

25   **VII.   CONCLUSION**

26           For the reasons set forth above, the motion to dismiss should be denied.  If the Court

27   decides to grant the motion, plaintiffs should be given leave to amend the Complaint.

28                                                     Respectfully submitted,

1

2                                                 BLECHER & COLLINS
                                                  James Robert Noblin
3                                                 Matthew E. Hess

4   Dated: October 21, 2004                       HENNEFER & WOOD

5

6                                        By    /s/ JAMES A. HENNEFER
                                                  James A. Hennefer
7                                               Attorneys for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28