1   Maxwell M. Blecher (SBN 026202)
    James Robert Noblin (SBN 114442)
2   Matthew E. Hess (SBN 214732)
    BLECHER & COLLINS, P.C.
3   611 West Sixth Street, 20th Floor
    Los Angeles, CA   90017
4   Telephone:  (213) 622-4222
    Facsimile:   (213)  689 1944
5
    James A. Hennefer (SBN 059490)
6   HENNEFER & WOOD
    425 California Street, 19th Floor
7   San Francisco, CA 94104-2296
    Telephone: (415) 421-6100
8   Facsimile:  (415) 421-1815

9   Attorneys for Plaintiffs

10
                    IN THE UNITED STATES DISTRICT COURT
11
                    FOR THE NORTHERN DISTRICT OF CALIFORNIA
12

13  NEWCAL INDUSTRIES, INC., a California   )   CIVIL NO. C 04 2776JCS
    Corporation; CPO, LTD., a California    )
14  Corporation; PINNACLE DOCUMENT         )   MEMORANDUM OF POINTS AND
    SYSTEMS, INC., a California Corporation; )   AUTHORITIES IN OPPOSITION TO
15  PACIFIC OFFICE AUTOMATION, INC.,       )   DEFENDANTS' MOTIONS TO DISMISS
    an Oregon Corporation;  and KEARNS      )   FIRST AMENDED COMPLAINT
16  BUSINESS SOLUTIONS, INC., a South       )
    Carolina Corporation,                   )
17                                          )   _____
                    Plaintiffs              )
18                                          )   Date:       May 12, 2005
            vs.                             )   Time:       2:00 p.m.
19                                          )   Place:      Courtroom 5
    IKON OFFICE SOLUTIONS, INC., an Ohio    )   Judge:      Hon. Fern M. Smith
20  Corporation; and GENERAL ELECTRIC      )
    CAPITAL CORPORATION, a Delaware         )
21  Corporation,                            )
                                            )
22                  Defendants              )
    _____)
23

24

25

26

27

28

# TABLE OF CONTENTS

# TABLE OF CONTENTS

**Page(s)**

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  Antitrust Relevant Markets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        1.  Group of Buyers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        2.  Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.  R.I.C.O. Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        1.  Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        2.  Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        3.  Particularity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    C.  Lanham Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.  STATEMENT OF ISSUES TO BE DECIDED . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.  FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.  IKON and GE's Office Equipment Lease Business . . . . . . . . . . . . . . . . . . . . 8

    B.  Initial "IKON Contracts" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    C.  IKON Amendments; Flexed IKON Contracts . . . . . . . . . . . . . . . . . . . . . . . . . 8

    D.  Fraudulent IKON Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    E.  "Unfair Business Practices" and "Market Imperfections" . . . . . . . . . . . . . . . . 9

    F.  Relevant Markets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    G.  Foreclosure of Competition and Injury to Consumers . . . . . . . . . . . . . . . . . . 12

    H.  RICO Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    I.  Lanham Act False and Misleading Statements . . . . . . . . . . . . . . . . . . . . . . . 15

IV.  IKON'S MOTION FAILS TO MEET THE STRINGENT STANDARD

    APPLICABLE TO A MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    A.  Fed. R. Civ. P. 12(b)(6) Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    B.  No Heightened Standard of Pleading Applies in Antitrust Cases . . . . . . . . . . . 17

1    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

2    I.      ANTITRUST CLAIMS FOR RELIEF (First through Sixth Claims for Relief) . . . . . . . . 18

3            A.     The First Amended Complaint More Than Sufficiently

4                   Defines Antitrust "Relevant Markets" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

5                          1.     Market Definition Is a Question of Fact and Thus Not an Issue

6                                 That Can Be Resolved on a Motion to Dismiss Here . . . . . . . . . . . . . . . 18

7                          2.     IKON and GE Have Abandoned Their "No Single-Brand

8                                 Relevant Market" Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

9                          3.     A "Group of Customers" of a Particular Brand May Define

10                                An Antitrust "Relevant Market" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

11                                a.      Ninth Circuit "Relevant Market" Definition . . . . . . . . . . . . . . . . 19

12                                b.      DOJ/FTC Guidelines "Relevant Market" Definition . . . . . . . . . . 21

13                                c.      Application of DOJ/FTC Guidelines to IKON and

14                                        GE "Relevant Markets" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

15                                d.      Other DOJ/FTC Criteria Confirm the GE and IKON

16                                        "Relevant Markets" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

17                         4.     A "Contract" Between an Antitrust Plaintiff or Consumer

18                                And a Defendant Does Not Bestow *Per Se* Immunity . . . . . . . . . . . . . . 23

19           B.     The Complaint Gives IKON Sufficient Notice of Allegations of Exclusive

20                  Dealing (Second Claim for Relief) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

21           C.     The Complaint Gives IKON Sufficient Notice of Allegations of a Section One

22                  Tying Claim (Third and Fourth Claims for Relief) . . . . . . . . . . . . . . . . . . . . . . . 29

23           D.     The Complaint Gives IKON Sufficient Notice of Allegations of

24                  Monopolization and Attempt to Monopolize (Fifth and

25                  Sixth Claims for Relief) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

26   II.     RICO CLAIM FOR RELIEF (Eighth Claim for Relief) . . . . . . . . . . . . . . . . . . . . . . . . 30

27           A.     Plaintiffs Have Established Proximate Cause to Confer Rico Standing . . . . . . . . 30

28

1              1.     Plaintiffs Suffered Direct Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

2         B.   Plaintiffs' Alleged RICO Enterprise Contains The Requisite Structure . . . . . . . . 31

3         C.   Rule 9(b) Particularity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

4              1.     Mail & Wire Fraud Specificity . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

5   III.   LANHAM ACT CLAIM FOR RELIEF (Seventh Claim for Relief) . . . . . . . . . . . . . . . 34

6         A._____The Complaint Gives IKON Sufficient Notice of

7              Allegations of a Lanham Act Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

8   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Albert Pick-Barth v. Mitchell Woodbury Corp. 57 F. 2d 96 (1st Cir.)
*cert. denied*, 286 U.S. 552 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

Alcatel USA, Inc. v. DGI Techs, Inc., 166 F. 3d 772, (5th Cir. 1999) . . . . . . . . . . . . . . . . . . 4, 23

Amarel v. Connell, 103 F.3d 1492 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Acro-Tech, Inc. v. The Robert Jackson Family Trust, No. 01-447-K,
2001 W.L. 1471753 (D. Or. Sept. 6, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33

Associated General Contractors v. California State Council of Carpenters,
459 U.S. 519 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 30

Atari Corp. v. 3DO Co.,
No. C 94-20298, 1994 WL 723601 (N.D. Cal. May 16, 1994) . . . . . . . . . . . . . . . . . . . . 33

Brand Name Prescription Drugs Antitrust Litigation,
186 F.3d 781 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Brown Shoe Co. v. United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4

California Dental Ass'n v. FTC, 526 U.S. 756 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Chang v. Chen, 80 F.3d 1293 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 32

Chicago Bd. of Trade v. United States, 246 U.S. 231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.,
228 F.3d 24 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Concord Boat Corp. v. Brunswick Corp.,
207 F.3d 1039 (8th Cir.), cert. denied, 531 U.S. 979 (2000) . . . . . . . . . . . . . . . . . . . . . . 28

Conley v. Gibson,
355 U.S. 41, 78 S. Ct. 99 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Cook, Perkiss & Liehe, Inc. v. Northern California Collection Service, Inc.,
911 F.2d 242 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Cost Management Services, Inc. v. Washington Natural Gas Co.,
99 F.3d 937 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Datagate, Inc. v. Hewlett-Packard Co.,
60 F.3d 1421 (9th Cir. 1995), cert. denied, 517 U.S. 1115 (1996) . . . . . . . . . . . . . . . . . . 29

Eastman Kodak Co. v. Image Technical Services, Inc.,
504 U.S. 451, 112 S. Ct. 2072 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Edwards v. Marin Park, Inc.
    356 F.3d 1058, 1066 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Ernest W. Hahn, Inc. v. Codding,
    615 F.2d 830 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fednav Ltd. v. Sterling International,
    572 F. Supp. 1268 (N.D. Cal. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

George Lussier Enterprises, Inc. v. Subaru of New England, Inc.,
    1999 U.S. Dist. LEXIS 19769 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

George R. Whitten, Jr.Inc. v. Paddock Pool Builders, Inc., 508 F.2d 547
    (1st Cir. 1974), *cert. denied*, 421 U.S. 1004 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Gilligan v. Jamco, 108 F.3d 246 (quoting *Scheuer v. Rhodes*,
    416 U.S. 232, 94 S. Ct. 1683 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Hack v. Yale College, 237 F.3d 81, (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 24, 26, 27

Hewlett-Packard Co. v. Arch Associates Corp.,
    908 F. Supp. 265 (E.D. Pa. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

High Technology Careers v. San Jose Mercury News,
    996 F.2d 987 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Holmes v. Sec. Prot. Corp., 503 U.S. 253 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 30

Hospital Building Co. v. Trustees of Rex Hospital,
    425 U.S. 738, 96 S. Ct. 1848 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Imagineering, Inc. v. Kiewit Pacific Co., 976 F.2d 1303 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . 31

JM Computer Services, Inc. v. Schlumberger Technologies, Inc.,
    1997-2 Trade Cas. (CCH) ¶ 72,024 (N.D. Cal. May 3, 1996) . . . . . . . . . . . . . . . . . . . . . . 28

Lancaster Community Hospital v. Antelope Valley Hospital District,
    940 F.2d 397 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 31

LaSalvia v. United Dairymen of Arizona,
    804 F.2d 1113 (9th Cir. 1986), cert. denied, 482 U.S. 928 (1987) . . . . . . . . . . . . . . . . . . 16

Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,
    507 U.S. 163, 113 S. Ct. 1160 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

LePage's Inc. v. 3M,
    324 F.3d 141 (3d Cir. 2003), cert. denied, 124 S. Ct. 2932 (2004) . . . . . . . . . . . . . . . . . . 28

Los Angeles Land Co. v. Brunswick Corp. 6 F.3d 1422 (9th Cir. 1993)
    *Cert. denied*, 510 U.S. 1197 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

NCAA v. Board of Regents, 468 U.S. 85 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Newman v. Universal Pictures,
    813 F.2d 1519 (9th Cir. 1987), cert. denied, 486 U.S. 1059 (1988) . . . . . . . . . . . . . . . . 17

Nobelpharma Ab v. Implant Innovations, Inc.,
    930 F. Supp. 1241 (N.D. Ill. 1996), aff'd, 141 F.3d 1059 (Fed. Cir.),
    cert. denied, 525 U.S. 876 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

NYNEX Corp. v. Discon, Inc. 525 U.S.128 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Portland Retail Druggists Ass'n v. Kaiser Foundation Health Plan,
    662 F.2d 641 (9th Cir. 1981), cert. denied, 469 U.S. 1229 (1985) . . . . . . . . . . . . . . . . . 17

PSI Repair Services v. Honeywell, Inc.,104 F.3d 811 (6th Cir. )
    cert. denied, 520 U.S. 1265 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421, 1434 (9th Cir.) . . . . . . . . . . . . . . . . . 19

Republic of Panama v. BCCI Holdings,
    119 F.3d, 935 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Rothman v. Vedder Park Management, 912 F.2d 315 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . 30

Queen City Pizza, Inc. v. Domino's Pizza, Inc.,
    124 F.3d 430 (3d Cir. 1997), cert. denied, 523 U.S. 1059 (1998) . . . . . . . . . . . . . . . Passim

Scheuer v. Rhodes, 416 U.S. 232, 94 S. Ct. 1683 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

SMS Systems Maintenance Services v. Digital Equip. Corp.,
    188 F.3d 11 (1st Cir. 1999), cert. denied, 528, U.S. 1188 (2000) . . . . . . . . . . . . . . . . . . 26

Southland Sod Farms v. Stover Seed Co.,
    108 F.3d 1134 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Standard Oil Co. v. United States, 221 U.S. 1 (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Systemcare, Inc. v. Wang Laboratories Corp.,
    117 F.3d 1137 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Syufy Enterprises v. American Multicinema, Inc.,
    793 F.2d 990 (9th Cir. 1986), cert. denied, 479 U.S. 1031 (1987) . . . . . . . . . . . . . . . . . 17

Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.,
    875 F.2d 1369 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

Twin City Sportservice, Inc. v. Charles O. Finley & Co.,
    676 F.2d 1291 (9th Cir.), cert. denied, 459 U.S. 1009 (1982) . . . . . . . . . . . . . . . . . . . . . 18

U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.,
    7 F.3d 986 (11th Cir. 1993), cert. denied, 512 U.S. 1221 (1994) . . . . . . . . . . . . . . . . . . 19

United Industries Corp. v. Clorox Co.,
    140 F.3d 1175 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

United States v. Employing Plasterers' Ass'n,

347 U.S. 186, 74 S. Ct. 452 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Garlick, 240 F.3d 789 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

United States v. Riccobene, 709 F.2d 214 (3rd Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 31

United States v. Turkette, 452 U.S. 576 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Universal Avionics Systems Corp. v. Rockwell Int'l Corp., 2001-2001 CCH Trade
    Cases, ¶ 73,439 at 91677 (D. Ariz. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Usher v. City of Los Angeles,
    828 F.2d 556 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Walker Distributing Co. v. Lucky Lager Brewing Co.,
    323 F.2d 1 (9th Cir. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Western Parcel Express v. United Parcel Service,
    190 F.3d 974 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## STATUTES, RULES AND REGULATIONS

15 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 19, 22

18 U.S.C. § 1961 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 29

Fed. R. Civ. P. 8(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Fed. R. Civ. P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Local Rule 7-4(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## MISCELLANEOUS

2A Phillip E. Areeda et al., Antitrust Law ¶ 516 (2d ed. 2002) . . . . . . . . . . . . . . . . . . 3, 20, 26, 28

DOJ/FTC Horizontal Merger Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 17, 26

4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition
§ 27:38 (4th ed. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

1    Plaintiffs herein (jointly "NewCal") submit this single[1] "Memorandum of Points and

2    Authorities in Opposition to Defendants' Motions to Dismiss First Amended Complaint" in

3    opposition to the two motions by defendant IKON Office Solutions, Inc. ("IKON") and General

4    Electric Capital ("GE") to dismiss NewCal's First Amended Complaint pursuant to Rule 12, Fed.

5    R. Civ. Proc.

6    **I.    INTRODUCTION**

7        **A.    Antitrust Relevant Markets**

8        The antitrust issue raised in this action is a simple, but very important one.  Can a proposed

9    "relevant market," which otherwise satisfies all of the legal and economic criteria of an antitrust

10   "relevant market," one in which market power can be exercised, be *per se* <u>legal</u>, because it either:

11   (1) involves a particular <u>group of buyers</u> for defendant's products or services; or simply because

12   (2) the customers have signed a <u>contract</u> with the defendant?

13       This "***per se* immunity**" for a competitor which sells copier equipment <u>initially</u>, but <u>later</u>

14   restrains its customers in other relevant markets (sometimes known as "aftermarkets") is precisely

15   what the United States Supreme Court rejected in *Eastman Kodak Co. v. Image Technical*

16   *Services, Inc.* 504 U.S. 451, 479 n.29 (1992) ("*Kodak*").  This, the Supreme Court said in *Kodak*,

17   would be  "a radical departure from this Court's antitrust law" and "has no support for it in [the

18   Court's] jurisprudence or the evidence of the case."  *Kodak*  504 U.S. at 479 n.29 (1992)

19       Looking carefully at each of the two issues raised by IKON and GE in their Rule 12

20   motion, through the lens of *Kodak*, brings the fatal flaws in these arguments into focus.

21       (1) <u>Group of Buyers</u>   In *Kodak* a group of customers, who <u>initially</u> bought Kodak brand

22   equipment in a competitive copier equipment market, <u>later</u> needed Kodak brand parts (products)

23   and maintenance (service) for that equipment.  The Court found these customers' <u>later</u>

24   ("aftermarket") needs for parts and service were separate antitrust "relevant markets" even though

25

26       [1] Plaintiffs' in combining their opposition memoranda to IKON and GE's two (2) motions in
     a single Memorandum have exceeded the page limit set in Local Rule 7-4(b) for each of their
27   opposition memoranda, which is 25 pages, but have limited the combined Memorandum to
     considerably under the limit allowed for two oppositions.
28

1   there was competition in the broader copier equipment market.  IKON and GE customers having

2   bought equipment in a competitive copier market, likewise have <u>later</u> needs for replacement

3   equipment. This replacement equipment market can be, and in this case does constitute an antitrust

4   "relevant market."

5         The fact that the replacement equipment supplied by IKON and GE may be the same as that

6   supplied in the <u>initial</u> sale in the broader competitive copier equipment market makes no

7   difference.  Different "relevant markets" do not require different products but may be the <u>same</u>

8   product, sold to different groups of buyers. *Brand Name Prescription Drugs Antitrust Litigation*,

9   186 F.3d 781 (7th Cir. 1999)(two relevant markets for the same prescription drugs consisting of

10  different buyers); *In re Tenneco* 98 FTC 464 (two relevant markets for the same shock absorbers).

11        (2) <u>Contract</u>  In *Kodak* these customers each had a contract to buy the equipment –

12  sometimes purchasing it outright or financing it long term.  The Court found copier ownership

13  created "switching costs," which, with market imperfections, prevented owners from substituting

14  other copiers and availing themselves of  the competitive copier equipment market.  Customers

15  with Kodak copiers were locked-in to non-competitive relevant aftermarkets for service and parts

16  by their ownership and market imperfections.  IKON and GE customers are likewise locked-in to

17  purchasing replacement equipment and service from IKON and GE through the long-term Flexed

18  IKON Contracts and "Market Imperfections."  (FAC ¶¶ 11, 51)

19                    **1.    Group of Buyers**

20        The DOJ/FTC Guidelines recognize that an antitrust "relevant market" may consist of a

21  particular group of customers.  "Where a hypothetical monopolist likely would discriminate in

22  prices charged to different groups of buyers, distinguished, for example, by their uses or locations,

23  the Agency may delineate **different relevant markets corresponding to each such buyer group**.

24  . . . A **relevant market of this kind is described by a collection of products for sale to a given**

25  **group of buyers**." (*DOJ/FTC Guidelines*, Section 1.0.  Emphasis supplied.)

26        So has the Supreme Court: "[t]he boundaries of [for antitrust purposes] such a submarket

27  may be determined by examining such practical indicia as . .  **distinct customers** . . ." *Brown Shoe*

28

1   *Co. v. United States*, 370 U.S. 294, 325 (1962) (Emphasis supplied.)

2       So has the Ninth Circuit: "A 'market' is any grouping of sales, whose sellers, if unified by a

3   monopolist or a hypothetical cartel, would have market power in dealing with **any group of**

4   **buyers**." *Rebel Oil Co. v. Atlantic Richfield Co.* 51 F. 3d 1421, 1434(9th Cir.) (Emphasis

5   supplied.)

6       So do antitrust treatises: "A relevant market is **a grouping of sales such that customers**

7   **cannot easily switch** to something else in response to a price increase in that grouping."  Areeda &

8   Hovenkamp, *Antitrust Law*, (2d ed. 2002), ¶ 519a. (Emphasis supplied.)

9       IKON and GE fail to understand that while a "relevant market" does involve products or

10  services, as NewCal has alleged in the First Amended Complaint, it ultimately involves the

11  customers ("group of buyers") which need those products or services and their reaction to an

12  increase in price.  It is over such customers that market power is determined.   It is their product

13  preferences which determine "substitutability" and price sensitivities which determine "cross-

14  elasticity" of demand.  Determination of "relevant market" is really  more customer driven than

15  product or service driven.  A *per se* rule of immunity, which excludes groups of buyers as a

16  potential relevant market, where all other criteria of an antitrust relevant market are met, would be

17  a radical departure from classic antitrust law.

18                  **2.     Contract**

19      IKON's and GE's position that a "relevant market" may never be defined to include a

20  group of buyers under contract with a defendant is, likewise a departure from classic antitrust law.

21  In *Kodak* all of the owners of Kodak copiers constituted the "group of buyers" for the antitrust

22  relevant markets for parts and service in the antitrust aftermarkets.  For purposes of antitrust

23  analysis there is was no economic or legal distinction in *Kodak* between owners who owned their

24  copiers outright and those who had long term contracts to lease/purchase them.

25      The issue of whether an antitrust "relevant market" exists and whether market power can be

26  exerted in such market, when a contract between an antitrust plaintiff or consumer and an antitrust

27  defendant is present, generally arises under three circumstances. **(1)** The plaintiff had knowledge at

28

1   the time the _initial_ contract was entered into, in a competitive market, of the alternatives,

2   restrictions and market risks present in signing the contract.  **(2)** The plaintiff attempts to rely on

3   the effects of the _initial_ contract and _not_ on: (a) tortious conduct; and (b) market imperfections to

4   show market power and injury to competition.  **(3)** The defendant did not have any market power

5   over a significant market share of customers in a competitive interbrand market in which the _initial_

6   contract was signed.  _(See, Queen City Pizza, Inc. v. Domino's Pizza, Inc._, 124 F.3d 430 (3d Cir.

7   1997), _cert. denied_, 523 U.S. 1059 (1998); _Alcatel USA, Inc. v. DGI Techs., Inc._ 166 F.3d 772, 781

8   (5th Cir. 1999); _PSI Repair Services v. Honeywell, Inc_ 104 F. 3d 811, 819 (6th Cir.), _cert. denied_,

9   520 U.S. 1265 (1997); _Hack v. Yale College_, 237 F.3d 81, 85 (2d Cir. 2000).

10       None of these circumstances is even close to those alleged in NewCal's First Amended

11   Complaint ("FAC"). **(1)** Virtually none of the IKON and GE customers had knowledge at the time

12   they signed the IKON Amendments (not the _initial_ IKON Contracts) that they were being

13   defrauded and locked-in to IKON and GE replacement equipment and service.   Indeed, the IKON

14   and GE personnel were trained to "con" the customers to prevent them from having knowledge.

15   (FAC ¶¶ 6-8)   **(2)** IKON and GE employed a great deal more than simply the force of the _initial_

16   contract provisions to exert market power over customers with Flexed IKON Customers.  They

17   employed "Market Imperfections" (FAC ¶11) and "Unfair Businesses Practices" (FAC ¶12) in

18   addition to the  _subsequently_ _obtained_ fraudulent IKON Amendments (which produced the Flexed

19   IKON Contracts)  to exert market power.  (3) There was not just a single IKON or GE customer

20   with a fraudulently obtained Flexed IKON Contract and over whom the market power from Market

21   Imperfections[2] and Unfair Business Practices were exercised,[3] but a very significant market share –

22   over 20% of the entire market for Copier Equipment, over 40% of the market for Canon and Ricoh

23   Copier Service market and over 80% of the replacement Copier equipment market for Flexed

24   IKON Contracts.  (FAC ¶ 10)

25       IKON and GE make no attempt to examine the "practical indicia" set out in the FAC and to

26

27       [2]  FAC ¶¶ 11, 18, 21, 23-24, 42, 44, 47, 49 and 83.

28       [3]  FAC ¶¶ 12-13, 18, 21, 23-24, 42, 44, 47, 49, 58 and 83.

1   assess whether these meet the criteria for an antitrust relevant market. *Brown Shoe Co. v. United*

2   *States,* 370 U.S. 294, 325 (1962). (FAC ¶¶ 47-53)  IKON and GE put forth no analysis at all of

3   whether there is  "reasonable interchangeability" and  "cross-elasticity of demand" with other

4   Copier Equipment and Copier Service for customers with IKON Flexed Contracts.  The First

5   Amended Complaint alleges detailed facts showing there is <u>not</u>.  (FAC ¶¶ 11, 12-14, 18, 20, 22,

6   42, 44-45). IKON and GE put forth no analysis of whether there is "price discrimination" or other

7   factors determinative of whether a "relevant market" is present. (FAC ¶¶ 2, 9, 18, 20-21, 42, 44,

8   50, 53, 61 and 87) The First Amended Complaint shows there <u>is</u>.  These case-by-case factors, not

9   rote *per se* presumptions, are supposed to be determinative of whether an antitrust "relevant

10  market" exists.  This total failure is fatal to IKON and GE's motion as to the antitrust claims for

11  relief.

12        IKON and GE reliance exclusively on their  *per se* immunity rule that a "contract-based

13  class of customers is not a valid antitrust market" (IKON Memo, 7:8-10) and that "a relevant

14  market based on IKON customers that have contracts with IKON is not permitted under antitrust

15  law." (GE Memo, 14:9-11, quoting the Court's December 23, 2004 *Order*[4]) is incorrect in the face

16  of the allegations, deemed to be true, in the First Amended Complaint.   IKON's and GE's claims

17  that NewCal's relevant market fails "as a matter of law" (IKON Memo 7:10, GE Memo 14:14) is

18  not supported in antitrust law.   Neither IKON's and GE's *per se* immunity rule, nor examination

19  of the "actual market realities" and "economic reality of the market at issue[5]" (even if IKON and

20  GE had chosen to do such examination – which they did not)  supports exclusion of the "relevant

21  markets" alleged in the First Amended Complaint.

**B.**    <u>**RICO Claims**</u>

**1.**    <u>**Standing**</u>

24        IKON's and GE's attempt to blur the issue around the "by reason of" language in 18 U.S.C

___

26       [4]   "Order Granting IKON Office Solutions, Inc.'s and General Electric Capital Corporation's
27   Motions to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)" (herein after "*Order*")

28       [5] *Kodak*, 504 U.S. 466-467.

1   § 1964(c) and to apply a number of different directness cases is unable to change the fact that

2   NewCal has alleged in the First Amended Complaint two different types of direct injury resulting

3   from IKON and GE's unlawful conduct.  <u>First</u>,  plaintiffs have made direct buy-out payments

4   based on fraudulently obtained and vigorously enforced contracts that customers had entered into

5   with IKON and GE.  (FAC ¶¶ 159, 161)   <u>Second</u>,  plaintiffs have been foreclosed from specific

6   customer accounts due to the high buy-out demands on flexed contracts. (FAC ¶¶ 159, 162)  These

7   satisfy the RICO standing requirements set out in *Holmes v. Sec. Prot. Corp.,* 503 U.S. 253, 269

8   (1992) and in the Ninth Circuit decisions following *Holmes.*  Plaintiffs' injury, which qualifies

9   under the injury standard of Section 4 of the Clayton Act, also qualifies under RICO.  *Holmes*, at

10  269.

### 1.     Enterprise

12      The RICO enterprise alleged in the First Amended Complaint consists of separate legal

13  entities which have joined together to provide services as a collective to the end consumer, namely

14  IKON and GE customers.  (FAC ¶¶ 146-147)  As the members contractual agreements set forth, a

15  structure for decision making as well as a mechanism for controlling and directing the enterprises

16  affairs exists. (FAC ¶ 148) The structure requirement does not mean that the same person needs to

17  make all the decisions, nor does it preclude the delegation of authority. *United States v. Riccobene*,

18  709 F.2d 214, 222 (3rd Cir. 1983).  Contrary to GE's contention, all of the separate legal entities in

19  the RICO enterprise do not have to participate in the decisions in furtherance of criminal activity.

20  *See, Wagh v. Metris Direct, Inc.*, 348 F.3d 1102, 1112 (9th Cir. 2003)

### 3.     Particularity

22      In a RICO action in which an alleged predicate act is fraud, the plaintiff must plead with

23  particularity time, place, and manner of each act of fraud as well as showing the role of each

24  defendant in each scheme. *Lancaster Community Hospital v. Antelope Valley Hospital District*,

25  940 F.2d 397, 405 (9th Cir. 1991). Plaintiffs have included in their First Amended Complaint a

26  detailed account of the date of occurrence, the parties involved in the communication, the business

27  locations, the conduct of each defendant and the contents of the misrepresentations in each scheme.

28

1   (FAC ¶¶ 154-156) These are more than sufficient to give IKON and GE notice of the particularity

2   of the fraud allegations under Rule 9(b), Fed. R. Civ. Proc.

3       **C.      Lanham Act**

4       The alleged fraudulent statements in the First Amended Complaint, as set out below, are

5   not mere "puffery" but are each "quantifiable" by IKON's and GE's own records.

6

7   **II.    STATEMENT OF ISSUES TO BE DECIDED**

8       Pursuant to Local Rule 7-4(a)(3), this Opposition to the Motion to Dismiss the First

9   Amended Complaint  raises the following issues:

10      1.    Whether there is *per se* immunity in "aftermarkets" for replacement equipment and
              service for IKON and GE customers subject to Flexed IKON Contracts because
11            they involve: (a) a particular group of customers for equipment and service; or (b) a
12            contract with defendants.

13      2.    Whether, when "practical indicia" of NewCal's three  "relevant markets" alleged in
14            the First Amended Complaint are analyzed, these satisfy the requirements for
15            antitrust relevant markets.

16      3.    Whether, in spite of their satisfying the requirements for antitrust relevant markets,
17            NewCal's "relevant markets" alleged in the First Amended Complaint fall within
18            the holdings in *Queen City Pizza* and *Hack*.

19      4.    Whether contracts restricting competition in a substantial share of the market, which
20            were procured by tortious conduct like fraud are subject to antitrust scrutiny under
              Section 1 of the Sherman Act, 15 U.S.C. § 1, or are "reasonable" restrains of trade.
21

22      5.    Whether the extensive precedent establishing that exclusive dealing doctrine may be
23            applied to contracts whose impact is exclusive as well as whose terms are explicitly
              exclusive should may be disregarded under Section 1 of the Sherman Act, 15
24            U.S.C. § 1.

25      6     Whether the holdings in *Kodak* may be disregarded to dismiss Newcal's tying
26            claims under Section 1 of the Sherman Act, 15 U.S.C. § 1.

27      7.    Whether the NewCal plaintiffs, by direct payment to IKON and GE for fraudulent
28

1    contracts obtained and enforced through RICO violations, have standing under
2    RICO, 18 U.S.C. § 1961, et seq.

3    8.    Whether the "enterprise" requirement for a RICO violation has been met by
4          NewCal plaintiffs.

5    9.    Whether Newcal plaintiffs' extensive and detailed  pleading of the predicate acts
6          underlying its RICO claim should be deemed to contain insufficient particularity for
7          mail fraud under Fed. R. Civ. Proc., Rule 9(b).

8    10.   Whether the inherently factual determination of distinguishing puffery from
9          misleading advertising should be undertaken as a matter of law from the face of the
10         First Amended Complaint to preclude Lanham Act claims.

## III.   FACTS

### A.    IKON and GE's Office Equipment Lease Practices

This is an action against defendants IKON and GE for fraudulent and anticompetitive business practices. (FAC ¶¶ 1, 12-13, 18, 21, 23-24, 42, 44, 47, 49, 58 and 83) These practices were used nationwide by IKON, by GE and by IKON's former 100% owned subsidiary, IOS Capital, LLC ("IOS Capital").  (FAC ¶¶ 1, 61-78)   IOS Capital was acquired by GE in March 2004 and became directly involved in these practices.  (FAC ¶¶ 2, 15-17, 18-19, 21-24)  The practices center around: (1) IKON and GE fraudulently extending office equipment leases -- known as "flexing" such leases  (FAC ¶¶ 1, 5, 65-82); and (2) IKON and GE fraudulently enforcing these extended leases  (FAC ¶¶ 9, 13, 15, 37, 147).

### B.    Initial "IKON Contracts"

IKON, IOS Capital and GE  (d/b/a IKON Financial Services™) sold, financed and administered lease/rental contracts for office equipment ("**IKON Contracts**"). (FAC ¶¶ 3-4) These IKON Contracts were for copiers, printers and facsimile equipment and for related servers, network equipment, accessories and software that were sold in bundled contracts ("**Copier Equipment**").  (FAC ¶¶ 3-4)  The IKON Contracts provide businesses with equipment financing for their Copier Equipment.  The financing is bundled with supplies, parts and service ("**Copier**

1   Service"). (FAC ¶ 4) The IKON Contracts are for fixed periods, typically for five (5) years. (FAC

2   ¶ 4) The IKON Contracts themselves are often obtained under false pretenses – principally by

3   selling the contracts on their alleged flexibility, without disclosing IKON's purpose and intent to

4   fraudulently exact, as a price for any change in the contract, a lengthy extension of all IKON

5   equipment under contract with the customer. (FAC ¶¶ 4, 62-64)

6            **C.    IKON Amendments; Flexed IKON Contracts**

7            After obtaining the IKON Contract, IKON fraudulently obtained one or more

8   "amendments" or "addenda" to the IKON Contracts  ("**IKON Amendments**") from a very large

9   percentage of its customers. These IKON Amendments, also known as "flexes," extended IKON

10  Contracts well beyond their original term ("**Flexed IKON Contracts**"). (FAC ¶¶ 5, 56, 65-82)

11           **D.    Fraudulent IKON Intent**

12          IKON intended and knew its business practices to be fraudulent. (FAC ¶¶ 1, 6-8, 62-82)  It

13  knew that they were designed to "con" their customers. (FAC ¶¶ 6-8)  IKON designed the IKON

14  Amendment forms to conceal their purpose and claimed legal effect. (FAC ¶¶ 68-73)  IKON

15  trained its sales persons when "flexing" a customer not to disclose to the customer that IKON

16  would claim an extension of the IKON Contract for each Amendment. (FAC ¶¶ 65-82)  IKON

17  removed and then refused the requests of its own employees to include standardized written

18  disclosures to the customers about the Amendment. (FAC ¶¶ 68-72)   IKON trained its sales

19  persons how to engage in active deception of customers. (FAC ¶¶ 73-75)  IKON personnel even

20  sang about "con-ing" their customers. (FAC ¶ 7)

21          The "cons" were successful.  IKON and GE (which bought Flexed IKON Contracts at a

22  substantial discount) demanded and obtained exorbitant buyouts at amounts as high as fifty (50)

23  times the equipment's market value. (FAC ¶ 8)  IKON customers were foreclosed from

24  competition and fraudulently locked-in to extended contracts if they did not pay the buy-outs.

25  (FAC ¶¶ 2, 8, 10, 18, 20, 24, 103, 107, 108 and 115) IKON and GE collected supracompetitive

26  prices and leveraged the Flexed IKON Contracts into new supracompetitively priced contracts.

27  (FAC ¶¶ 2, 8, 9, 18, 20-22, 42, 44, 48, 50, 61, 87, 107, 125, 129 and 135)

28

1    **E.** **"Unfair Business Practices" and "Market Imperfections"**

2    IKON and GE used (a) market imperfections unique to Copier Equipment, Copier Service

3 and cost-per-copy contracts  ("**Market Imperfections**") (FAC ¶¶ 11, 18, 21, 23-24, 42, 44, 47, 49

4 and 83); and  (b) fraudulent and anticompetitive acts and practices ("**Unfair Business Practices**")

5 (FAC ¶¶ 12-13, 18, 21, 23-24, 42, 44, 47, 49, 58 and 83) to accomplish their goals and to damage

6 plaintiffs and consumers.  They used these to: (a) obtain Flexed IKON Contracts; (b) obtain

7 additional IKON Contracts and IKON Amendments at inflated prices;  (c) enforce  Flexed IKON

8 Contracts: (d) prevent competition; and (e) grossly overcharge consumers for Copier Equipment

9 and Service.  IKON and IOS Capital have been able, by use of their Market Imperfections, Unfair

10 Business Practices and Flexed IKON Contracts, to prevent reasonable interchangeability and

11 cross-elasticity of demand for competitors' products (FAC ¶¶ 11, 12-14, 18, 20, 22, 42, 44-45), to

12 obtain supracompetitive prices from consumers (FAC ¶¶ 2, 8, 9, 18, 20-22, 42, 44, 48, 50, 61, 87,

13 107, 125, 129 and 135) and to price discriminate (FAC ¶¶ 2, 9, 18, 20-21, 42, 44, 50, 53, 61 and

14 87) against their customers with Flexed IKON Contracts for Copier Equipment and Service.

15    These fraudulent and anticompetitive acts and practices affected and foreclosed a

16 substantial share of the larger relevant  market for Copier Equipment (exceeding 20%) and the

17 relevant market for Canon and Ricoh brands of Copier Service (exceeding 40%),  as well as

18 virtually all of the relevant markets (exceeding 80%) for replacement Copier Equipment for IKON

19 customers with Flexed IKON Contracts and for Copier Service for IKON customers with Flexed

20 IKON Contracts. (FAC ¶¶ 2, 8, 10, 18, 20, 24, 103, 107, 108 and 115)

21    The "Market Imperfections" used to preclude competition include the following.

22 (a) IKON and IOS Capital employed almost exclusively cost-per-copy contracts, bundling together

23 Copier Equipment and Copier Service payments. (b) These cost-per-copy contracts prevent any

24 possibility of life-cycle costing the Copier Equipment.  (c) IKON and IOS Capital's Unfair

25 Business Practices were concealed from their customers and not a part of any of their buying

26 calculus.  (d) IKON and IOS Capital's Unfair Business Practices were not known by customers at

27 all and not generally known in the industry.  (e) Copier Equipment loses 90% of its residual value

28

over its first five (5) years.  (f) Markets for used copier equipment do not function efficiently and actual residual market values are low.  (g) Most Copier Equipment is acquired through financing. (h) Industry practices limit the ability to finance large "buy outs" of equipment and unused service. (i) It is not practicable to buy out a cost-per-copy copier contract until it is 70% elapsed, even without it being "flexed."  (j) Profits on the placement of Copier Equipment are small compared to the profits on the service.  (k) The lead times and costs to switch vendors for Copier Equipment and Copier Service are high. (FAC ¶ 11)

The "Unfair Business Practices" used to get consumers into Flexed IKON Contracts included: (a) using deceptive forms for the IKON Amendments, in which forms prior explanatory language warning of the extensions has been intentionally omitted to deceive the consumer; (b) intentionally concealing and misrepresenting to the consumer the purpose of the IKON Amendments and the meaning of their terms; (c) using various "pretexts" like a "free trial" or swapping out poor-performing equipment in order to get IKON Amendments signed; (d) refusing to break out payments for each machine; (d) concealing from the customer and refusing to break out equipment payments and service payments; and (e) using the leverage of prior fraudulently obtained IKON Contracts or Amendments and collection threats to force the consumer into signing new IKON Contracts or Amendments. (FAC ¶ 12)

The "Unfair Business Practices" were applied not only to obtain Flexed IKON Contracts, but also by IKON and GE to enforce such contracts after they were obtained.  After the Flexed IKON Contracts were obtained, additional Unfair Business Practices were used to prevent IKON customers from attempting to switch to Copier Equipment or Copier Service of competitors; to prevent them from challenging unlawfully obtained IKON Contracts and Flexed IKON Contracts; and to prevent them from challenging exorbitant "buy-out" or "lease end" payment demands. (FAC ¶ 13)

The Unfair Business Practices applied by IKON and IOS Capital, after Flexed IKON Contracts were obtained, involve an array of additional fraudulent and anticompetitive practices. These included:  (a) delays in producing, and refusals to produce the IKON Contracts or IKON

Amendments (of which the customers were often deprived at the time of signing); (b) refusals to give "buy out" amounts, to substantiate them or to break them down; (c) denial of responsibility or the shifting of responsibility between IKON and IOS Capital for problems with contracts, buy-outs, service or billing, depending on whom the customer was dealing with at the time; (d) continued billing (with penalties) for unlawful charges; (e) cut-off of service to the subject equipment or equipment under different contracts from those in dispute; (f) making false adverse credit reports against the customer; (g) employing outside legal counsel to threaten or sue the customer without regard to the merits of such suit; (h) refusing to take back equipment as to which a contract was lawfully terminated -- requiring the customer to leave it in place or to store it; (i) quoting unreasonable rigging and transport charges; and   (j) threatening or billing additional large lease-end charges. (FAC ¶ 14)

The practical effects of the Market Imperfections, Unfair Business Practices and Flexed IKON Contracts employed by IKON and GE have been and are to:  (a) allow IKON and GE to claim and obtain payments for Copier Equipment after payment of the original fully-amortized value of the equipment, beyond amounts the customer intended or agreed to pay and greatly in excess of its fair market value;  (b) force the customer into entering into new contracts or amendments with IKON or GE at supracompetitive prices, which prices discriminate against such customers;  (c) allow IKON and GE to claim and obtain exorbitant "buy-out" payments for termination of Flexed IKON Contracts; (d) allow IKON and GE to claim and obtain an array of exorbitant "lease-end" payments; and  (e) unreasonably foreclose competition for replacement Copier Equipment and Service for customers subject to Flexed IKON Contracts.  (FAC ¶ 18)

## F. **Relevant Markets**

The principal relevant markets, in which IKON and GE, through their fraudulent and anticompetitive acts, have been and are able to foreclose competition, prevent reasonable substitutability, preclude cross-elasticity of demand, obtain supracompetitive prices and price discriminate between customers for Copier Equipment and Service, comprise two (2) markets. These  are the relevant markets for:  (i) replacement Copier Equipment for IKON and GE

1   customers with Flexed IKON Contracts; and (ii) Copier Service for IKON and GE customers with

2   Flexed IKON Contracts.  IKON and GE have foreclosed over 80% of these markets from

3   competition. (FAC ¶ 20)

4       Two (2) additional, broader, relevant markets, in which IKON and GE have unreasonably

5   restrained a substantial amount of trade, are the markets for:  (i) the sale of Copier Service for

6   Canon and Ricoh brand Copier Equipment; and  (ii) the  sale of Copier Equipment.   IKON and GE

7   have foreclosed competition in over 40% and 20% of these markets, respectively.  (FAC ¶ 20)

8       **G.**     **Foreclosure of Competition and Injury to Consumers and Plaintiffs**

9       IKON's and GE's intent and purpose in employing the Market Imperfections, Unfair

10  Business Practices and Flexed IKON Contracts was for IKON and GE to be able to preclude

11  competition from, to price discriminate against and to charge supracompetitive prices to consumers

12  of Copier Equipment and Copier Service in the two (2) primary relevant markets (the markets for:

13  (i) replacement Copier Equipment for IKON and GE customers with Flexed IKON Contracts; and

14  (ii) Copier Service for IKON and GE customers with Flexed IKON Contracts).  IKON and GE are,

15  through the use of these devices, able to impose on such consumers in these two (2) relevant

16  markets significant (exceeding 10%) and nontransitory (exceeding one (1) year) price increases,

17  without consumers switching to competitive substitutes.   (FAC ¶ 21)

18      Consumers with Flexed IKON Contracts are charged prices by IKON and GE which are

19  often 50%, 100%, or more, than potential substitutes in order to replace IKON as their vendor for

20  Copier Equipment and Copier Service.  Small IKON and GE customers, including schools,

21  churches and non-profits, often find themselves with equipment worth only $1,000-$2,000 in the

22  used equipment market and facing claims by IKON and GE for "buy outs" and "lease end"

23  payment claims of over $100,000.  Larger IKON customers, including hospitals, associations and

24  businesses, often find themselves with dozens of machines worth $20,000-$50,000 in the used

25  equipment market and facing claims by IKON and GE in the range of $500,000-$1,000,000.  Such

26  consumers pay supracompetitive prices to IKON and GE for long periods of time, often for years

27  because reasonable substitutability is not an option.   Such consumers are unable,  practically, to

28

1   substitute competitive Copier Equipment or Copier Service for that of IKON and GE.  There is

2   little or no cross-elasticity of demand between IKON and GE supplied Copier Equipment and

3   Copier Service to IKON and GE customers with Flexed IKON Contracts and competitors' Copier

4   Equipment and Copier Service. (FAC ¶ 22)

5         The Market Imperfections, Unfair Business Practices and Flexed IKON Contracts were

6   used, by IKON and GE to force customers to deal exclusively with IKON, IOS Capital and GE for

7   replacement Copier Equipment and for Copier Service.  IKON's own written description of the

8   intent and desired result of their use of the  combination of the Market Imperfections, Unfair

9   Business Practices and Flexed IKON Contracts states that these make it "***virtually impossible for***

10  ***competition to penetrate [the customer's] account***." (FAC ¶ 23) (Emphasis supplied.)

11        Plaintiffs were competitors with IKON and IOS Capital and now compete with IKON and

12  GE for the sale and financing of Copier Equipment and for Copier Service, except where IKON

13  and GE are employing the Unfair Business Practices, Market Imperfections and  Flexed IKON

14  Contracts to exclude competition.   (FAC ¶ 24)  As a result of IKON's and GE's unlawful actions

15  in employing the Market Imperfections, Unfair Business Practices and Flexed IKON Contracts,

16  plaintiffs:  (a) have been foreclosed and are being foreclosed from competing for the sale of Copier

17  Equipment and Copier Service to IKON and GE customers with Flexed IKON Contracts (FAC ¶¶

18  2, 8, 10, 18, 20, 24, 103, 107, 108, 115, 159, 162) ; (b) have paid unlawful "buy-outs" and lease-

19  end payments (FAC ¶¶ 2, 17, 24, 60, 161) ; and (c) have been injured in their businesses and

20  property (FAC ¶¶ 24, 153-154, 159, 164)

21        **H.     RICO Activities**

22        IKON and GE were associated with an enterprise and were persons distinct from the

23  enterprise.  They were members of the group comprising the enterprise. (FAC ¶ 145) The

24  enterprise consisted of the association in fact of separate legal entities which provide IKON

25  customers with "Copier Equipment;" "Copier Service;" "IKON Contracts;" and administration of

26  the IKON Contracts. (FAC ¶ 146 )    These separate legal entities included, IKON, Office

27  Solutions, Inc. which sells the Copier Equipment and provides the Copier Service; the Copier

28

1   Equipment manufacturers (Canon, USA, Inc.,  Ricoh Corporation, Savin Corporation, Oce North

2   America, Inc., Hewlett Packard Company) which provide the Copier Equipment; the entities which

3   provide financing to buy the Copier Equipment from the manufacturers (IOS Capital, Inc., General

4   Electric Capital Corporation); and the entities which assist in administering and enforcing the

5   IKON Contracts and Amendments (Experian, Inc. (TRW), Duane Morris, LLP, Barry & Randolph,

6   LLP). (FAC ¶ 146)

7        The enterprise had an ongoing organization with a framework for making decisions,

8   functioned as a continuing unit and had ascertainable structure and systems of authority guiding its

9   operations, separate and apart from the pattern of racketeering in which the enterprise engaged.

10  (FAC ¶ 147) The structure of the "enterprise" consisted of contracts by and between the legal

11  entities associated in fact, which contracts were for the purpose of providing IKON customers with

12  Copier Equipment, Copier Service and IKON Contracts.  (FAC ¶¶ 146-147)  The "enterprise"

13  thereby had a continuity of structure and personnel (as witnessed, for example, by GE's acquisition

14  of IOS Capital, Inc. on March 31, 2004 in which GE took over all of the some 450 personnel of

15  IOS Capital which administer IKON Contracts.) (FAC ¶ 147)

16       The pattern of racketeering activity alleged was separate from the enterprise and differed

17  from the usual and daily activities of the enterprise because each of these activities can be and are,

18  within the enterprise, conducted legally.  (FAC ¶¶ 149-150)

19       The enterprise received substantial financial benefits from the alleged pattern of

20  racketeering. (FAC ¶¶ 151, 161)

21       The "predicate acts" which constituted the alleged "pattern of racketeering activity"

22  involved mail fraud and wire fraud.  (FAC ¶¶ 152-153 )  Each of the acts of mail fraud or wire

23  fraud involved IKON and GE knowingly causing the use of the mails, private carrier services or

24  wires with the specific intent and "for the purpose of executing" a  "scheme or artifice to defraud"

25  in that each  was material and incidental to an essential element of the scheme. (FAC ¶¶ 153-154)

26  The "scheme to defraud" included IKON and GE's use of dishonest methods and schemes, as set

27  out above, to deprive plaintiffs and customers, by trick, deceit, chicane or overreaching, of money,

28

1   property and the right of honest services. (FAC ¶¶ 153-154)   There were at least sixteen (16) acts

2   constituting mail and wire fraud and predicate offenses, with specific detail of the time, place,

3   persons and contents of the alleged misrepresentations which spread over nearly 2 ½ year and

4   involved seven (7) different IKON and GE accounts and nine (9) different IKON and GE

5   personnel.  (FAC ¶¶ 155-156)

6          Plaintiff competitors  were the intended target of the activities constituting the RICO

7   violations, they paid monies to IKON and GE and were also foreclosed from specific accounts as a

8   direct result of the RICO violations, such injury to plaintiffs was foreseeable and there were no

9   independent, intervening causes of such injury.  (FAC ¶¶ 160-162)

10         **I.       Lanham Act False and Misleading Statements**

11         In connection with these activities, IKON and GE made false and misleading statements by

12  the dissemination of pieces of promotional literature to thousands of accounts by IKON and GE's

13  sales representatives and employees, which numbered over 2,000.  (FAC ¶ 138)  These false and

14  misleading statements were much more specific that mere "puffing" and included the following

15  quantitative statements: (a) that IKON and GE would deliver 'flexibility' in their 'cost-per-copy'

16  contracts and that they would lower copying costs for customers; (b) that IKON and GE would

17  deliver 95% up-time service in their IKON Contracts; (c) that original IKON Contracts were

18  intended by IKON to be for a fixed term of sixty (60) months and would expire at the end of that

19  term; (d) that IKON Amendments for sixty (60) months applied only to the changes on the

20  Amendment, not to the entire fleet of IKON or GE Copier Equipment of the customer; and (e) that

21  IKON's "flexing" practices had been declared legal by this Court in its opinion of December 23,

22  2004. (FAC ¶ 139) These statements were made deliberately and they actually deceived or had the

23  tendency to deceive a substantial segment of IKON and GE customers and influenced or was likely

24  to influence the purchasing decisions of those IKON and GE customers.  (FAC ¶ 140)

25

26  **IV.     IKON'S MOTION FAILS TO MEET THE STRINGENT STANDARD**

27  **         APPLICABLE TO A MOTION TO DISMISS**

28

**A.      Fed. R. Civ. P. 12(b)(6) Legal Standards**

A motion to dismiss for legal insufficiency under Fed. R. Civ. P. 12(b)(6) is a disfavored motion that is rarely granted and then only in extreme circumstances. *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746, 96 S. Ct. 1848, 1853 (1976). "On a motion to dismiss..., the court must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).

The Supreme Court has repeatedly instructed that a district court may not grant a motion to dismiss for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957). "'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Gilligan v. Jamco*, 108 F.3d 246, 249 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686 (1974)).

In ruling on a motion to dismiss, "[t]he Court's inquiry is whether the allegations state a sufficient claim under Fed.R.Civ.P. 8(a)." *Fednav Ltd. v. Sterling International*, 572 F. Supp. 1268, 1270 (N.D. Cal. 1983).  Rule 8(a) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  Each and every fact need not be set out in detail; the complaint need only outline the claim for relief. *LaSalvia v. United Dairymen of Arizona*, 804 F.2d 1113, 1116 (9th Cir. 1986), <u>*cert. denied*</u>, 482 U.S. 928 (1987).

**B.      No Heightened Standard of Pleading Applies in Antitrust Cases**

In *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 167-68, 113 S. Ct. 1160, 1163 (1993), the Supreme Court made clear that no "'heightened pleading standard'" exists for complex civil cases or any other type of case. *See also, United States v. Employing Plasterers' Ass'n*, 347 U.S. 186, 189, 74 S. Ct. 452, 454 (1954) ("[W]here a bona fide [antitrust] complaint is filed that charges every element necessary to recover, summary dismissal of a civil case for failure to set out evidential facts can seldom be justified.").  The Ninth Circuit has also consistently held that "notice pleading" principles apply to antitrust cases, which are not to be

judged by a higher or different standard than other cases. *Walker Distributing Co. v. Lucky Lager Brewing Co.*, 323 F.2d 1, 3-4 (9th Cir. 1963); *Ernest W. Hahn, Inc. v. Codding*, 615 F.2d 830, 834-35 (9th Cir. 1980). "[A]ntitrust pleadings need not contain great factual specificity." *Portland Retail Druggists Ass'n v. Kaiser Foundation Health Plan*, 662 F.2d 641, 648 (9th Cir. 1981), <u>cert. denied</u>, 469 U.S. 1229 (1985).  The antitrust plaintiff "'need only allege sufficient facts from which the court can discern the elements of an injury resulting from an act forbidden by the antitrust laws.'" *Cost Management Services, Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 950 (9th Cir. 1996) (quoting *Newman v. Universal Pictures*, 813 F.2d 1519, 1522 (9th Cir. 1987), <u>cert. denied</u>, 486 U.S. 1059 (1988)).

## **ARGUMENT**

### I.  **ANTITRUST CLAIMS FOR RELIEF**

####  **A.  The First Amended Complaint More Than Sufficiently Defines Antitrust "Relevant Markets"**

#####  **1.  Market Definition Is a Question of Fact and Not an Issue That Can be Resolved on a Motion to Dismiss Here**

In their motions, IKON and GE still have not addressed long line of Ninth Circuit precedent establishing that market definition is, in almost all circumstances, a question of fact for the jury, not a question of law for the judge.  *High Technology Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993); *Syufy Enterprises v. American Multicinema, Inc.*, 793 F.2d 990, 994 (9th Cir. 1986), *cert. denied*, 479 U.S. 1031 (1987); *Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1299 (9th Cir.) ("The definition of the relevant market is basically a fact question dependent upon the special characteristics of the industry involved. . . ."), *cert. denied*, 459 U.S. 1009 (1982); As a factual question, market definition is particularly ill-suited for resolution on a motion to dismiss.

Even more importantly, IKON and GE, in proffering their *per se* immunity presumption and failing to address the NewCal plaintiffs' "practical indicia" of market power pleaded in the

FAC,  ignore the long line of Supreme Court precedent in antitrust law holding that specific facts

of the proposed relevant market at issue must be addressed and that the court may not rely on legal

presumptions to dismiss antitrust actions based on "relevant market' definition "as a matter of

law."  This was summarized in *Kodak*,  in applying a more stringent standard for summary

judgment, as follows:

> Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law. This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the "particular facts disclosed by the record." *Maple Flooring Manufacturers Assn. v. United States*, 268 U.S. 563, 579, 45 S.Ct. 578, 583, 69 L.Ed. 1093 (1925); *Du Pont*, 351 U.S., at 395, n. 22, 76 S.Ct., at 1007, n. 22; *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 70, 97 S.Ct. 2549, 2568, 53 L.Ed.2d 568 (1977) (WHITE, J., concurring in judgment). [Footnote and cites omitted.] In determining the existence of market power, and specifically the "responsiveness of the sales of one product to price changes of the other," *Du Pont*, 351 U.S., at 400, 76 S.Ct., at 1010; see also *id*., at 394-395, and 400-401, 76 S.Ct., at 1007, and 1010, this Court has examined closely the economic reality of the market at issue. [Footnote and cites omitted.]

*Kodak*, 504 U.S. at 466-467.

### 2.    IKON and GE Have Abandoned Their "No Single-Brand Relevant Market" Argument

IKON and GE have now abandoned one of their earlier  *per se* immunity contentions,

raised their initial Rule 12 motion: that an antitrust relevant market cannot, as a matter of law, be

defined by the products or service of a single company.  *Kodak*, as IKON and GE concede, clearly

dispensed with this notion:

> Kodak also contends that, as a matter of law, a single brand of a product or service can never be a relevant market under the Sherman Act.  We disagree.  The relevant market for antitrust purposes is determined by the choices available to Kodak equipment owners. . . . . This Court's prior cases support the proposition that in some instances one brand of a product can constitute a separate market . . . The proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers.

*Kodak,* 504 U.S. at 481-82, 112 S. Ct.  at 2090.

*Kodak's* holding has been followed by many courts defining an antitrust "relevant market"

1   to constitute the products or service of a single company.  *See, e.g.,  U.S. Anchor Mfg., Inc. v. Rule*

2   *Industries, Inc.*, 7 F.3d 986, 997-98 (11th Cir. 1993) (market defined as a single brand of anchors),

3   cert. denied, 512 U.S. 1221 (1994); *Nobelpharma Ab v. Implant Innovations, Inc*., 930 F. Supp.

4   1241, 1250 (N.D. Ill. 1996) (relevant market was single brand of dental implant), *aff'd*, 141 F.3d

5   1059 (Fed. Cir.), *cert. denied*, 525 U.S. 876 (1998); *Hewlett-Packard Co. v. Arch Associates*

6   *Corp.*, 908 F. Supp. 265, 270 (E.D. Pa. 1995) (complaint adequately alleged that relevant market

7   limited to printers sold by Hewlett-Packard).

8              **3.       A "Group of Customers" of a Particular Brand May Define an**

9                          **Antitrust "Relevant Market"**

10            Since the products or services of a single company can be defined as an antitrust "relevant

11  market," given a lack of substitutability and cross-elasticity of demand within such a market, a

12  "sub-market" for customers for a particular brand is also possible.[6]

13                          **a.       Ninth Circuit "Relevant Market" Definition**

14            The Ninth Circuit has recognized, that an antitrust "relevant market" is defined by a "group

15  of buyers" over which a defendant can exercise market power.  The court held in *Rebel Oil Co. v.*

16  *Atlantic Richfield Co.*  51 F. 3d 1421, 1434(9th Cir.) (quoting *Thurman Indus. v. Pay 'N Pak*

17  *Stores*, 875 F.2d 1369, 1374 (9th Cir. 1989)), *cert denied*, 516 U.S. 987 (1995) that: "A '[relevant]

18  market' is any grouping of sales, whose sellers, if unified by a monopolist or a hypothetical cartel,

19  would have market power in dealing with ***any group of buyers***.  *See* Phillip Areeda & Herbert

20  Hovenkamp, *Antitrust Law*, ¶ 518.1b, at 534 (Supp. 1993)."  (Emphasis supplied).  IKON and GE

21  are alleged in the FAC to be precisely such monopolists which have market power over the "group

22  of buyers" which have IKON Flexed Contracts.  They have in excess of 80% of the market for

23  replacement equipment and service for these customers.   (FAC ¶ 10).

24

25            [6] As many cases have observed, the *Brown Shoe* indicia of "submarkets" related to
    substitutability in demand and cross-elasticities of demand are the same as the criteria for
26  determining an antitrust "relevant market." *Rothery Storage & Van Co. v. Atlas Van Lines*, 792 F.2d
    210, 218n.4, (D.C. Cir 1986) cert. denied, 479 U.S. 1033 (1987); *see, Forsyth v. Humana*, 114 F.3d
27  1467, 1467, 1476 (9th Cir.) *aff'd on other grounds,* 525 U.S. 299 (1997).  A "submarket" is an
    antitrust "relevant market"
28

**b.      DOJ/FTC Guidelines "Relevant Market" Definition**

The *DOJ/FTC Guidelines*[7] lay out the same  criteria for defining an antitrust  "relevant market" which is subject to the Sherman Act.  They state plainly that an antitrust relevant market may exist, where, as with IKON and GE, there is price discrimination: "a relevant market of this kind is described by ***a collection of products for sale to a given group of buyers***.  *DOJ/FTC Guidelines*, Section 1.0) (Emphasis supplied.)

The analysis by which the Guidelines reach this is relatively straight forward, employing a hypothetical monopolist and testing consumer reaction to analyze antitrust "relevant markets".[8]

**(1)** The Guidelines begin with the basic antitrust rule of *Brown Shoe*[9] that market definition is founded on ***customer demand*** conditions – "substitutability" and "cross-elasticity of demand."  The Guidelines state: "[m]arket definition focuses solely on demand substitution factors – i.e. possible ***consumer* responses**." (DOJ/FTC Guidelines, Section 1.0)

**(2)** The Guidelines then ask whether the hypothetical monopolist "would be in a position to exercise market power" in the proposed "relevant market."  This requires evaluation of the "likely demand responses of consumers to a price increase."[10]  They state:

> A price increase could be made unprofitable by consumers either switching to other products or switching to the same product produced by firms at other locations.  The nature and magnitude of these two types of demand responses, respectively

---

[7]  The U.S. Department of Justice Antitrust Division and the Federal Trade Commission issued their "Horizontal Merger Guidelines" on April 2, 1992 and revised them on April 8, 1997. These summarize the "analytic framework and specific standards normally used" for enforcement of the antitrust laws, including Section 1 of the Sherman Act, 15 U.S.C. § 1.  Although not binding on the courts, they are often used as a reference or analytical tool by courts for complex antitrust issues. *See, Olin Corp. v. F.T.C.*, 986 F.2d 1295, 1300 (9th Cir. 1993);  *Prometheus Radio Project v. F.C.C.*, 373 F.3d 372, 419 (3d Cir. 2004); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 597 (1st Cir. 1993). "

[8]  Professors Areeda and Hovencamp, in *Antitrust Law*, also use the Guidelines postulation of a hypothetical monopolist to analyze relevant markets and refer to this as a "helpful methodology." Areeda and Hovencamp, *Antitrust Law*, (2 ed. 2002) ¶¶ 530a, 929a.

[9]  370 U.S. 294, 325 (1992).

[10]  "Substitutability" is a surrogate for what products an appreciable number of the group of buyers would find as practicable substitutes for the proposed relevant market products in response to the increase in price. "Cross-elasticity" is a surrogate for what products an appreciable number of the group of buyers would switch demand to, in response to an increase of price.

determine the scope of the product market and the geographic market. *(DOJ/FTC Guidelines*, Section 1.0)

(3)  The Guidelines then define the extent of market power which would justify a separate relevant market to be that group of consumers (buyers) over which a monopolist would likely impose a "small but significant and nontransitory" increase in price without appreciable substitution or shift in demand. (DOJ/FTC Guidelines, Section 1.0)

(4) Finally, and most importantly for determining whether buyers of Copier Equipment and Copier Service who have Flexed IKON Contracts, in this action may be a separate relevant market, the Guidelines state that:

> "[W]here a hypothetical monopolist likely would discriminate in prices charged to different groups of buyers, distinguished, for example, by their uses or locations, the Agency may delineate different relevant markets corresponding to each such buyer group....A relevant market of this kind is described by a collection of products for sale to a given group of buyers." (*DOJ/FTC Guidelines*, Section 1.0)[11] (Emphasis supplied.)

Therefore, if the defendant is able to and is treating a customer groups differentially, then there may be a "relevant market" for the products limited to sales to just that buyer group of those products.

### c.    Application of DOJ/FTC Guidelines to IKON and GE "Relevant Markets"

Applying each of these criteria for determining an antitrust "relevant market" to the FAC and to IKON's and GE's potential market power makes clear that there are separate relevant markets for customers under Flexed IKON Contracts, for replacement Copier Equipment and for Copier Service.

(1) Non-IKON/GE replacement equipment and service, for that group of buyers with Flexed IKON Contracts, is not a practicable substitute to over 80% of such customers  – there is no appreciable "substitutability." (FAC ¶¶ 10, 21, 23-24)   IKON and GE are able to get 50% or 100% more for their replacement equipment and service from the group of buyers with Flexed IKON

---

[11]  "The Agency will consider additional relevant product markets consisting of a particular use or uses by groups of buyers of the product for which a hypothetical monopolist would profitably and separately impose at least a "small but significant and nontransitory" increase in price." (DOJ/FTC Guidelines, Section 1.12)

1  Contracts with less than a 20% shift in demand to non-IKON/GE offerings – there is no "cross-

2  elasticity of demand."  (FAC ¶¶ 10, 22-24)   IKON's goal of making it "***virtually impossible for***

3  ***competition to penetrate the account"*** and IKON's statement that flexing "creates separation from

4  the competition at the end of the original Agreement" mean, on their face, that IKON intended to

5  prevent substitution and cross-elasticity of demand.   (FAC ¶¶ 23-24, 44-45) They have been

6  successful in creating a separate "relevant market" for customers with Flexed IKON Contracts, and

7  now would have the Court rescue them with a *per se* immunity rule that ignores the facts and

8  IKON's own objectives.

9           (2)   Despite prices charged by IKON and GE for replacement Copier Equipment and

10  Copier Service to customers with Flexed IKON Contracts that are often "50%, 100% or more, than

11  potential substitutes" there is no appreciable demand response of these customers "either switching

12  to other products or switching to the same product produced by firms at other locations."   In

13  excess of 80% remain with IKON and GE.

14           **d.     Other DOJ/FTC Criteria Confirm the GE and IKON "Relevant
                        Markets"**

15

16           Another type of evidence that the DOJ and FTC specifically consider in determining

"relevant markets" is: "the timing and costs of switching products." (*DOJ/FTC Guidelines*, Section

17
   1.11(4) IKON's own Training Manual tauts the 'switching costs' which can be imposed on

18
   customers with Flexed IKON Contracts.  (FAC ¶¶ 45-46)   By IKON's own admission this group

19
   of buyers may be a "relevant market."

20
           One of the barriers to entry that DOJ / FTC also take into account in determining "relevant

21
   markets" is whether the defendant has tied up the customers with long-term contracts: "Factors that

22
   reduce the sales opportunities available to entrants include: ... (b) the exclusion of an entrant from a

23
   portion of the market over the long term because of vertical integration or forward contracting by

24
   incumbents." *(DOJ/FTC Guidelines*, Section 3.3)  IKON as the "incumbent" engages in long term

25
   "forward contracting" by flexing. (FAC  ¶¶ 48, 65-76)

26
           **4.     A "Contract" Between an Antitrust Plaintiff or Consumer and a Defendant**

27
                    **Does Not Bestow *Per Se* Immunity**

28

The issue of whether IKON and GE have "market power" in these "relevant markets" cannot be decided by a legal presumption "as a matter of law," as IKON and GE urge. There is no *per se* immunity for antitrust defendants where they have entered into a contract with a customer or even where some market power derives from a contract.

Section 1 of the Sherman Act forbids "every <u>contract</u> . . . in restraint of trade." (Emphasis supplied.) In *Standard Oil Co. v. United States*, 221 U.S. 1, 58 (1911), however, after reviewing the legislative history of the Sherman Act and common law rules on restraint of trade, the Supreme Court held that Congress did not intend to prohibit contract that caused insignificant or attenuated restraints of trade but only those contracts "which were unreasonably restrictive of competitive conditions." The principal that Section 1 prohibits only unreasonable restraints of trade has been repeatedly reaffirmed by the Supreme Court. *California Dental Ass'n v. FTC*, 526 U.S. 756, 769-81 (1999); *NYNEX Corp. v. Discon, Inc.* 525 U.S. 128, 133 (1998); *NCAA v. Board of Regents*, 468 U.S. 85, 98 (1984). Antitrust law has not gone full circle to declare that all contracts between consumers and antitrust defendants, even though they restrain trade are *per se* <u>legal</u>. The question here is not one of *per se* illegality or legality, but one of the "rule of reason." *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 in its classic framing of the question, which is still good law, stated:

> Every agreement concerning trade . . . restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

Since *Kodak* there has been considerable litigation over where to draw the line between: (1) the reasonable restraints of pure legally-obtained contractual power in an aftermarket; and (2) the unreasonable restraints of anticompetitively-obtained power in an aftermarket.

(1) Pure contractual power, deriving solely from a buyer <u>initially</u> signing a contract, although this results in subsequent restraints, has usually been considered to be a "reasonable"

1    restraint on trade.  This is particularly so where the restrictions of the initial contract are "generally

2    known." This line of cases has held that where the aftermarket sales policy was "generally known"

3    and thus presumed to be part of the buyers' reasoned decision calculus when they <u>initially</u> signed

4    their contract, there is no unreasonable restraint of trade.  *See, e.g.  Queen City Pizza, Inc. v.*

5    *Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997), *cert. denied*, 523 U.S. 1059 (1998)

6    (franchisee knew "aftermarket" restraints in signing initial agreement); *Hack v. Yale College,* 237

7    F.3d 81 (2nd Cir. 2000)(matriculating students knew Yale housing restrictions); and *Alcatel USA,*

8    *Inc. v. DGI Techs., Inc.*  166 F.3d 772 (5th Cir. 1999)(license of software known to always provide

9    for use only on manufacturer-provided equipment).   In *Queen City Pizza*, the Third Circuit

10   rejected a Section 2 claim based on a market limited to inputs "used in the operation of Domino's

11   stores."  124 F.3d at 437.  The *Queen City* court distinguished *Kodak* on the grounds that the "case

12   arose out of concerns about unilateral changes in Kodaks parts and repairs policies" while *Queen*

13   *City Pizza* plaintiffs "knew that Domino' Pizza retained significant power" to direct franchisees to

14   purchase particular inputs" after the plaintiff <u>initially</u>  signed the franchise contract.  124 F.3d at

15   440.

16          The determination that there is no unreasonable restraint imposed by such contracts is

17   buttressed in these cases by the fact that there was strong "primary market" competition at the time

18   of the buyer signing the <u>initial</u> contract.  *See, e.g. Queen City Pizza* (competition in primary market

19   for pizza franchises); *Hack* (competition in primary market for matriculating students); and *Alcatel*

20   (competition in primary market for software).

21          Here, of course, IKON and GE intentionally <u>concealed</u> from their customers, when they

22   <u>later</u> signed the Flexed IKON Contract in question (not the initial IKON Contracts), all of the

23   consequences.  They used  the deceptive IKON Amendments (FAC ¶¶ 68-72) and engaged in

24   company-trained fraudulent misrepresentations and concealment (FAC ¶¶ 73-79) .  It was

25   impossible for the IKON and GE Flexed IKON Contract buyers to engage in a reasoned decision

26   calculus of the restraints imposed when the signed the Flexed IKON Contract.   It was "generally

27   <u>not</u> known" that the IKON Amendments would result in the anticompetitive effects of

28

OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS FIRST AMENDED COMPLAINT
*NewCal Industries, Inc., et al. v. IKON Office Solutions, Inc., et al.* (Case No. C 04 2776JCS)

1  supracompetitive prices, buy-out demands and extended contracts on old equipment.

2       A fraudulently obtained restraint cannot, on its face, be "reasonable"  – one which was

3  obtained by buyer choice and reason.  Tortious conduct has been found to satisfy the antitrust

4  element of "unreasonable" restraints, if the other elements of an antitrust violation (e.g.

5  competitive injury) are also met.  In *Albert Pick-Barth v. Mitchell Woodbury Corp.*, 57 F.2d 96 (1st

6  Cir.), *cert. denied,* 286 U.S. 552 (1932), reaffirmed in *George R. Whitten, Jr. Inc. v. Paddock Pool*

7  *Builders, Inc., 508 F. 2d 547 (1st Cir. 1974), cert. denied*, 421 U.S. 1004 (1975), the First Circuit

8  held that tortious acts (pirating key personnel, trade secrets and customer lists) with the intent to

9  harm a competitor were *per se* violations of the Sherman Act – presumptively "unreasonable." The

10  Ninth Circuit declined to apply the *per se* rule of *Albert-Pick Barth* in *A.H. Cox & Co. v. Star*

11  *Machinery Co.,* 653 F.2d 1302, 1308 n.7 (9th Cir. 1981), applying a rule of reason analysis for

12  tortious conduct.  It relegated the plaintiff to "state tort law . . . [absent] . . . proof of

13  anticompetitive effect." *Id.*  at 1308.  Here, of course, there is not just tortious conduct (fraud) but

14  also the intent to foreclose IKON and GE competitors (FAC ¶¶ 45, 80), actual foreclosure (FAC ¶¶

15  10, 23,-24) and supracompetitive prices (FAC ¶¶ 21-22, 44).

16       Additionally, at the time the IKON and GE customers signed the Flexed IKON Contract (as

17  opposed to the <u>initial</u> IKON Contract) there was no "primary market" competition from other

18  copier manufacturers.  IKON's and GE's references to competition in the broad copier market are

19  totally misplaced.  Primary market competition in Copier Equipment played <u>no</u> role in the

20  execution of Flexed IKON Contracts.

21       (2)  True "aftermarket" restraints are usually found to be illegal as "unreasonable"

22  restraints on trade – particularly where the customer was misled or had no way of knowing about

23  the restraints that would be imposed subsequent to the <u>initial</u> contract.  This may occur where

24  the defendant changed its policy regarding aftermarket sales after the initial contract was signed,

25  without the knowledge of the buyer, as in *Kodak*.  It is also the case where there was active

26  concealment of aftermarket restraints.  Using the same rationale of *Queen City Pizza*, but reaching

27  a different result, *George Lussier Enterprises, Inc. v. Subaru of New England, Inc.,* 1999 U.S.Dist.

28

OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS FIRST AMENDED COMPLAINT
*NewCal Industries, Inc., et al. v. IKON Office Solutions, Inc., et al.* (Case No. C 04 2776JCS)
-26-

1  LEXIS 19769  upheld a complaint alleging the defendant had "concealed the [aftermarket] tying

2  arrangement until after [the plaintiff franchisees] became locked into their dealerships."  This is

3  also the case where it is not possible for the buyer to forecast the total cost of the contract (life-

4  cycle cost).  *See, e.g. SMS Systems Maintenance Services, v. Digital Equip. Corp.* 188 F.3d 11, 17

5  (1st Cir. 1999), *cert. denied*, 528 U.S. 1188 (2000); *Universal Avionics Systems Corp. v. Rockwell*

6  *Int'l Corp.*, 2001-2001 CCH Trade Cases, ¶ 73,439, at 91677-78 (D. Ariz. 2001).

7         Under any of these cases, IKON's and GE's "Flexed IKON Contracts" are clearly

8  "unreasonable" restraints on trade and not reasonable effects of a rational contracting process.

9         Additional factors, present here, push this case even further into the category of

10  "unreasonable" restraints and away from pure legally-obtained contractual power in an aftermarket.

11         **(1)** Here, there is not just a single contract affecting one buyer, but a nationwide corporate

12  policy,  restraining over 80% of IKON and GE's customers and all face the aftermarket Flexed

13  IKON Contract achieved by a fraudulent IKON Amendment.[12]

14         **(2)**  Here, the <u>stated</u> intent and purpose of the IKON and GE enforcement of the

15  fraudulently obtained Flexed IKON Contract is anticompetitive and is directed at plaintiff

16  competitors – to make it "impossible for competition to penetrate [the customer's] account."  (FAC

17  ¶ 23)  Plaintiff competitors, who may lack standing under state contract or tort law to recover for

18  the fraud,[13] have direct antitrust standing since they were "targeted" by IKON and GE in the

---

20     [12]  The examples of legal "post contract" power in Areeda & Hovencamp, *Antitrust Law*,
21  Second Edition, ¶ 519a, of a single purchaser of coal or a single lessee of a commercial building, are,
   of course, not apropos to this case, as the treatise recognizes in saying that "an economic market is a
22  grouping of sales such that market circumstances make consumer substitution very difficult [and]
   numerous things make may make it difficult for any particular buyer to substitute one product for
23  another."

24     [13]  Cases in which an alleged antitrust injury by a non-competitor would be better addressed
   through a breach of contract or business tort cause of action by the victim are not apropos.  *See,*
25  *Associated General Contractors v. California State Council of Carpenters*, 459 U.S.519, 526-27
   (1983)(conduct alleged by plaintiffs "might constitute a breach of contract, an unfair labor practice,
26  or perhaps even a common-law fraud or deceit" as to them but was did not constitute competitive
   injury.  Likewise, Areeda & Hovencamp's argument in *Antitrust Law*, Second Edition, ¶ 519a, that
27  seller misrepresentation to a buyer should not turn "antitrust into a substitute for the law of fraud,
   misrepresentation, or unfair dealing generally" does not apply to targeted competitors not in contract
28  privity or the direct victim of the fraud.

1  practice challenged and suffered anticompetitive foreclosure.  *Amarel v. Connell*, 102 F. 3d 1492,

2  1509-1510 (9th Cir. 1997) ("The plaintiff supplier's injury is sufficiently direct where that supplier

3  "both competes with defendants and is their target." Areeda and Hovenkamp, Antitrust Law at ¶

4  375d."); *see*, *Associated General Contractors v. California State Council of Carpenters*, 459

5  U.S.519, 536 n.33 (1983)   In the *Hack* case, the Yale students were not targeted by Yale

6  University and the University was not a competitor of theirs in any of their proposed "relevant

7  markets."

8       **(3)**   Here, much more is alleged in the FAC than pure contract lock-in as the basis for

9  IKON's and GE's "aftermarket" power.  "Market Imperfections" (including the almost exclusive

10  use of cost-per-copy contracts, unavailability of life-cycle costing, concealing of their Unfair

11  Business Practices, loss of 90% of equipment's residual value over the first five years,

12  inefficiencies in the used equipment, unusual financing practices in the industry, disproportionate

13  profits on equipment vs. service and long lead times to switch vendors) exploited by IKON and GE

14  are used in addition to the market power derived from the fraudulently-obtained Flexed IKON

15  Contracts.  (FAC ¶ 11)   "Unfair Business Practices" in addition to the fraudulent obtaining of the

16  Flexed IKON Contracts and the contracts themselves are also used by IKON and GE to exert

17  aftermarket power.  These include delay or refusal to produce contracts and amendments to buyers,

18  refusals to give "buy"out quotes or to substantiate them, blame-shifting for problems, billing and

19  charging penalties for unlawful charges, cut-off of service, false adverse credit reports, frivolous

20  litigation, refusal to allow returns of equipment, unreasonable lease-end charges and threatened

21  additional billings. (FAC ¶ 14)

22      NewCal's antitrust claims are not grounded in the pure contract power of the <u>initial</u> IKON

23  Contracts and are not governed by *Queen City Pizza*, *Hack* and that line of cases.  They are based

24  on the fraudulently obtained IKON Flexed Contracts and the extensive Market Imperfections and

25  Unfair Business Practices of IKON and GE.

26      **B.    The Complaint Gives IKON Sufficient Notice of Allegations of Exclusive**

27             **Dealing (Second Claim for Relief)**

28

1       IKON contends that Newcal's Section 1 Sherman Act exclusive dealing claim fails for the

2   same reasons that their conspiracy claim fails -- namely, because plaintiffs cannot properly define

3   the relevant market based on a group of buyers who have.  For the reasons discussed immediately

4   above, this argument should be rejected.

5       IKON also argues that plaintiffs' exclusive dealing claim fails because Newcal has not

6   pointed to any language in the contracts between IKON and its customers requiring exclusivity.

7   But IKON's literalistic definition of exclusive dealing is too restrictive to accord with the case law.

8   A number of courts have recognized the concept of *de facto* exclusive dealing, in which a

9   contractual arrangement that does not expressly require one party to deal exclusively with another

10  may nonetheless be deemed an exclusive dealing arrangement for Section One purposes.  For

11  instance, in *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (en banc), *cert. denied*, 124 S. Ct.

12  2932 (2004), 3M had a bundled rebate program requiring retailers to purchase a wide variety of 3M

13  products to obtain a discount on Scotch tape.  A retailer that purchased Scotch tape without

14  purchasing the other 3M products did not receive the rebate.  There was no explicit exclusive

15  dealing provision in the documents, but as a practical matter none of 3M's retailer customers

16  would carry competing products for fear of losing the discount.  The Court of Appeals affirmed the

17  jury's exclusive dealing verdict, holding that the bundled rebate program amounted to an exclusive

18  dealing claim in substance if not in form.  Various other courts have also recognized the *de facto*

19  exclusive dealing doctrine.  *See, e.g., Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th

20  Cir.), *cert. denied*, 531 U.S. 979 (2000); *see generally* 11 Areeda, *Antitrust Law,* ¶ 1807b (2d ed.

21  2002) (the antitrust laws condemn "not only express exclusive-dealing contracts but also contracts

22  that have the 'practical effect' of inducing exclusive dealing.")

23      Here, IKON's and GE's customers signed requirements contracts under which they would

24  purchase all equipment, maintenance, service, parts, and supplies from IKON or GE for a set

25  period of time.  Plaintiffs have alleged that it is economically impracticable for a customer to

26  replace this equipment.  (FAC ¶¶ 8, 22, 42, 45, 53, 114)  Plaintiffs are essentially trapped in their

27  relationship with IKON and cannot do business with competitors even if they are able to offer

28

1   more favorable specific terms. This arrangement satisfies the "exclusivity" requirement of

2   plaintiffs' exclusive dealing claim.

3         The authorities cited by IKON and GE, such as *Western Parcel Express v. United Parcel*

4   *Service*, 190 F.3d 974 (9th Cir. 1999), are inapposite.  In *Western Express,* the contracts were

5   readily terminable and did not prohibit the customers from doing business with other service

6   providers; a company could send some packages via UPS and others via Federal Express, for

7   example.  Id. at 976; *see JM Computer Services, Inc. v. Schlumberger Technologies, Inc.*, 1997-2

8   Trade Cas. (CCH) ¶ 72,024, at 81,087 (N.D. Cal. May 3, 1996), is also not on point because the

9   allegations in that case were so conclusory as to be meaningless; the plaintiff had provided no

10   details about any agreement with any person or entity.

11         **C.____The Complaint Gives IKON Sufficient Notice of Allegations of a Section One**

12                 **Tying Claim (Third and Fourth Claims for Relief)**

13         IKON's argument with respect to plaintiffs' tying claim is based upon exactly the same

14   flawed premise that underlies its argument vis-a-vis the restraint of trade claim; namely, that IKON

15   cannot, as a matter of law, have market power over a market defined as its own customer base. For

16   the reasons discussed above, IKON is incorrect.

17         In addition, it is important to note that *Kodak*  was itself a tying case, and that the Supreme

18   Court expressly held that Kodak had market power in the tying market.  504 U.S. at 465, 112 S. Ct.

19   at 2081.  Also, a number of *post-Kodak* authorities have held that the tying market may, in fact, be

20   defined as the defendant's own customer base. *See, e.g., Systemcare, Inc. v. Wang Laboratories*

21   *Corp.*, 117 F.3d 1137 (10th Cir. 1997); *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421 (9th

22   Cir. 1995), *cert. denied*, 517 U.S. 1115 (1996).

23         **D.____The Complaint Gives IKON Sufficient Notice of Allegations of Monopolization**

24                 **and Attempt to Monopolize (Fifth and Sixth Claims for Relief)**

25         IKON's and GE's attack on Newcal's monopolization and attempt to monopolize claims

26   stands or falls on the same "relevant market" and market power analysis Newcal has refuted above.

27   IKON has abandoned its argument with respect to these claims based on *Los Angeles Land Co. v.*

28

1    *Brunswick Corp.*, 6 F.3d 1422 (9th Cir. 1993), *cert. denied*, 510 U.S. 1197 (1994) in which the

2    allegations simply involved defendant's misconduct toward the single plaintiff and its principal,

3    and one discrete real estate transaction.  *Id.* at 1427.   Just as claims under the antitrust laws for a

4    "relevant market' based on one plaintiff's contract are not apropos, *Los Angeles Land* does not

5    apply to IKON and GE's anticompetitive actions.

6

7    **II.      RICO CLAIM FOR RELIEF** (**Eighth Claim for Relief**)

8             Plaintiffs' First Amended Complaint (FAC), including the incorporated facts of "Plaintiffs

9    RICO Statement" attached as Exhibit C to the FAC,  sufficiently states a claim under 18 U.S.C. §§

10   1962(c) and (d).  IKON and GE support their motions to dismiss by arguing that: (A) plaintiffs lack

11   standing as an improper party to assert RICO claims; (B) plaintiffs have failed to identify an

12   "enterprise" within the meaning of 18 U.S.C. § 1961(4); and (C) plaintiffs do not adequately allege

13   false statements of material fact with regards to the predicate acts of mail and wire fraud.

14           **A.  Plaintiffs Have Established Proximate Cause To Confer RICO Standing.**

15           The "by reason of" language used in 18 U.S.C. § 1964(c) imposes a requirement that a

16   plaintiff's injuries be both factually and proximately caused by the 18 U.S.C. § 1962 violation.

17   *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992).  Plaintiffs have alleged

18   that their injuries were an intentional result of the unlawful practices directed at both IKON and

19   GE customers as well as at competitors (FAC ¶¶ 159-160).[14]   Defendants try to frame the issue in

20   terms of "speculative" and "derivative" injuries, however, the facts support specific and direct

21   injuries suffered by plaintiffs (FAC ¶¶ 161-162).[15]

22           Plaintiffs' injury qualifies as direct antitrust injury under the injury standard of Section 4 of

23   the Clayton Act and therefore qualifies under RICO.  *Holmes*, at 269. The <u>stated</u> intent and purpose

24   of the IKON and GE enforcement of the fraudulently obtained Flexed IKON Contract is directed at

25

26           [14]  *See, also*, Plaintiff's RICO Statement, Question 4 (Quotations from IKON's "Field
     Training Manual")

27           [15]  *See, also,* Plaintiff's RICO Statement, Question 17 (Listing the damages sustained for
28   which each defendant is allegedly liable.)

1   plaintiff competitors – to make it "impossible for <u>competition</u> to penetrate [the customer's]

2   account." (FAC ¶ 23)   Plaintiff competitors have direct antitrust standing since they were

3   "targeted" by IKON and GE in the practice challenged and suffered anticompetitive foreclosure.

4   *Amarel v. Connell*, 102 F. 3d 1492, 1509-1510 (9th Cir. 1997) ("The plaintiff supplier's injury is

5   sufficiently direct where that supplier "both competes with defendants and is their target." Areeda

6   and Hovenkamp, Antitrust Law at ¶ 375d."); *see*, *Associated General Contractors v. California*

7   *State Council of Carpenters*, 459 U.S.519, 536 n.33 (1983)

8                          **1. Plaintiffs Suffered Direct injury**

9          Guided by the Supreme Courts holding in *Holmes*, the Ninth Circuit has established that a

10  direct relationship between a plaintiff's injury and the defendant's conduct is necessary.

11  *Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F.2d 1303, 1311-12 (9th Cir. 1992).  The Defendants

12  seek to portray the present case as one directly from the *Imagineering, Inc.* mold. However, the

13  facts alleged in the FAC do not support such a finding.  In *Imagineering, Inc*., the plaintiff

14  subcontractors were bringing an action for damages as a result of their prime contractors not

15  receiving specific jobs, allegedly due to the unlawful conduct of Kiewit Pacific Co. The Court

16  found that the direct harm would have been to the [competing] prime contractors and not to the

17  subcontractors. *Imagineering, Inc*. 976 F.2d at 1312.  The court goes on to note that "It was the

18  intervening inability of the prime contractors to secure the contracts that was the direct cause of

19  plaintiffs' injuries." *Id.* at 1312.  Plaintiffs' do not have such an intermediate event, once IKON

20  and GE "flex" a customer and enforce the fraudulently obtained contract, the result is either

21  Plaintiffs directly pay the "buy-out" or are directly foreclosed from that customer.  (FAC ¶¶ 159-

22  162)

23                  **B. Plaintiffs' Alleged RICO Enterprise Contains The Requisite Structure**

24         Plaintiffs allege an associated-in-fact enterprise including IKON Office Solutions, Inc,

25  Canon, USA, Inc., Ricoh Corporation, Savin Corporation, Oce North America, Inc., Hewlett

26  Packard Company, IOS Capital, Inc., General Electric Capital Corporation, Experian, Inc. (TRW),

27  Duane Morris, LLP, and Barry & Randolph, LLP.  (FAC ¶¶ 146-147) Each of the enterprise

28

1   members are separate legal entities.  The members of the enterprise are connected through a series

2   of contractual agreements (FAC ¶ 147)[16].  These agreements set up the structure within the RICO

3   enterprise and provide the legitimacy which makes the Defendants actions harder to detect. (FAC

4   ¶¶ 146-150)

5       An associated-in fact enterprise is proved through  "evidence of an ongoing organization,

6   formal or informal, and by evidence that the various associates function as a continuing unit."

7   *United States v. Turkette*, 452 U.S. 576, 583 (1981).  Plaintiffs have clearly alleged this with

8   sufficient detail.   (FAC ¶¶ 146-150)

9       At a minimum, to be an enterprise, an entity must exhibit "some sort of structure ... for the

10  making of decisions, whether it be hierarchical or consensual." *Riccobene*, 709 F.2d at 222. The

11  structure should provide "some mechanism for controlling and directing the affairs of the group on

12  an on-going, rather than an ad hoc, basis." *Id*. The structure requirement, however, "does not mean

13  that every decision must be made by the same person, or that authority may not be delegated." *Id*.

14   It also is not necessary to show that the organization "has some function wholly unrelated to the

15  racketeering activity." *Id.* at 223- 24. Rather, it is sufficient to show that the organization has an

16  existence <u>beyond</u> that which is merely necessary to commit the predicate acts of racketeering. *Id*. at

17  224. "The function of overseeing and coordinating the commission of several different predicate

18  offenses and other activities on an on-going basis is adequate to satisfy the separate existence

19  requirement." Id. (emphasis added).  *Chang v. Chen* 80 F.3d 1293, 1299  Again, these criteria have

20  clearly been met in the First Amended Complaint.  (FAC ¶¶ 146-150)

21      Contrary to GE's suggestion GE is alleged in the First Amended Complaint to have done a

22  great deal more, than carry out the "regular practices" of administering contracts – their "usual and

23  daily activities."  *Wagh v. Metris Direct, Inc.*, 348 F.3d 1102, 1112 (9th Cir. 2003) (GE Memo, pp

24  11-12)  GE also "used dishonest methods and schemes, as set out [in ¶¶ 1-153 of the FAC] to

25  deprive Plaintiffs and customers, by trick, deceit, chicane or overreaching, of money" and

26  "engaged in overt acts in furtherance of the conspiracy including sending fraudulent billings and

27  ────────

28  [16]  *See, also*, Plaintiff's RICO Statement, Question 6(b)

1   demands for buy-outs based on the Flexed IKON Contracts and for lease-end payments and threats

2   of litigation over non payment of such fraudulent billings and demands." (FAC ¶¶ 153, 155, 158)

3        GE's specific fraudulent acts are well-detailed in the First Amended Complaint. They

4   include: (a) demanding a buy-out based on "forged IKON Amendments alleged to support the

5   471,000 buy-out demand" (FAC ¶ 155.vii); (b) trying to support a proposal for a GE Copier

6   Contract based on "an IKON forgery on an IKON Amendment and "fraudulently add[ing] a six (6)

7   month delay in IKON signing an Amendment (FAC ¶ 155.viii); (c) trying to support a proposal for

8   a GE Copier Contract by misrepresenting that they "covered equipment that IKON did not have at

9   the Hospital;" (FAC ¶ 155.x); and (d) made fraudulent buy-out demands that did not represent

10  actual charges for which the customer was liable. (FAC ¶ 155.xv)  Plaintiffs have more than

11  sufficiently pleaded the contents of GE's communications, what is false about them and why they

12  are false. *Edwards v. Marin Park, Inc.* 356 F.3d 1058, 1066 (9th Cir. 2004)

13       GE's additional claim (GE Memo, pp. 5-8), that after taking over all of the facilities of IOS

14  Capital and all of their personnel (FAC ¶¶ 1, 15-16 and 36-38), it was ignorant of any of this fraud,

15  that it cannot be charged with knowledge of its employees and that it is entitled to plead ignorance

16  of fraud which is apparent on the face of forged documents or in GE's accounting records is totally

17  unsupported by law or the facts.  Plaintiffs have more than sufficiently pleaded GE's knowledge

18  that its actions were fraudulent.  Their allegations are far more than "merely conclusory and

19  unsupported by any factual allegations." *Republic of Panama v. BCCI Holdings*, 119 F.3d, 935

20  (11th Cir. 1997)

21       **C.  Rule 9(b) Fed. R. Civ. P. Particularity**

22       "RICO actions alleging the predicate act of fraud must plead with particularity the time,

23  place, and manner of each act of fraud, plus the role of each defendant in each scheme." *Acro-*

24  *Tech, Inc. v. the Robert Jackson Family Trust*, No. 01-447-KI, 2001 WL 1471753 at *3 (D. Or.

25  Sept. 6, 2001); citing *Lancaster Community Hospital v. Antelope Valley Hospital District*, 940

26  F.2d 397, 405 (9th Cir. 1991).

27       Plaintiffs have detailed the "time" (exact dates); the "place" (location of the

28

1   misrepresentation, *viz.* " Fremont, California," "Walnut Creek, California," "Ridgecrest,

2   California,' etc.), the "manner of the fraud" (*viz.,* by mail, by facsimile, by e-mail, by telephone,

3   etc.); and the role of each defendant (with their names, employers and the content of their

4   communications). (FAC ¶¶ 155.i. - 155.xiv) *Miscellaneous Service Workers, etc. v. Philco-Ford*

5   *Corp. WDL Div.*, 661 F.2d 776, 782 (9th Cir 1981)(pleader must state the time place and specific

6   content of the false representations as well as the identities of the parties to the misrepresentations).

7   These allegations clearly satisfy the RICO requirements and those of Fed.R. Civ. P. 9(b) (that "in

8   all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be

9   stated with particularity) at the pleading stage to give the defendant sufficient notice of the alleged

10  predicate acts. *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985) (allegations of fraud must be

11  specific enough to give defendants notice of the misconduct alleged to constitute the fraud so that

12  they can defend).

13  **1.     Mail & Wire Fraud Specificity**

14      "To allege a violation of the mail fraud statute, 18 U.S.C. § 1341, a plaintiff must show:

15  (1) defendants formed a scheme or artifice to defraud; (2) defendants used the United States mail

16  or caused a use of the mail in furtherance of the scheme; and (3) defendants did so with the specific

17  intent to deceive or defraud." *Acro-Tech, Inc. v. the Robert Jackson Family Trust*, No. 01-447-KI,

18  2001 WL 1471753 at *3 (D. Or. Sept. 6, 2001); citing *Rothman v. Vedder Park Management*, 912

19  F.2d 315, 316 (9th Cir. 1990). "The crime of wire fraud under 18 U.S.C. § 1343 has the same

20  elements but substitutes use of the wires for use of the mail." *Acro-Tech, Inc. v. the Robert Jackson*

21  *Family Trust*, No. 01-447-KI, 2001 WL 1471753 at *3 (D. Or. Sept. 6, 2001); citing *United States*

22  *v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2001).

23      Plaintiffs have likewise shown, in great detail, in the First Amended Complaint : "a scheme

24  or artifice to defraud" (FAC ¶¶ 62-82); use of the United States mail or wires "in furtherance of the

25  scheme" (FAC ¶¶ 155.i. - 155.xiv) and the specific intent of both IKON (FAC ¶¶ 1, 6-8, 62-82)

26  and GE as the successor to IOS Capital (FAC ¶¶ 1, 15-16, 36-38 and 62-82) to deceive or defraud.

27

28

1    **III.    LANHAM ACT CLAIM FOR RELIEF (Seventh Claim for Relief)**

2        **A.____The Complaint Gives IKON Sufficient Notice of Allegations of a Lanham Act**

3            **Violation**

4        IKON argues that plaintiffs' Lanham Act claim is barred because all of the

5    misrepresentations of fact at issue herein amount to nothing more than unactionable "puffing."

6    (IKON Memo, p. 13)   For two reasons, this contention is without merit as to the First Amended

7    Complaint. .

8        First, IKON's argument is factually misleading because it simply ignores the specific

9    claims made by IKON and GE: (a) that IKON and GE would deliver "flexibility" in their 'cost-per

10   copy contracts and lower copying costs, when they had a specific written intent to increase such

11   costs with every "flex: (b) that IKON would deliver 95% up-time service, when IKON and GE

12   never intended to; (c) that the original IKON Contracts were intended to be for a term of sixty (60)

13   months and would expire at the end of that term, when IKON and GE had written policies not to

14   allow that; (d) that IKON Amendments for sixty (60) month terms applied only to the changes on

15   the Amendment, when IKON and GE had written policies and kept accounting records showing

16   that this was not true; and (e) that the order of this Court on December 23, 2004 declared that

17   IKON's "flexing' practices were legal.  (FAC ¶ 139)

18       "Puffery is 'exaggerated advertising, blustering, and boasting upon which no reasonable

19   buyer would rely. . . .'" *United Industries Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998)

20   (citation omitted).  The authorities cited by IKON, such as *Cook, Perkiss & Liehe, Inc. v. Northern*

21   *California Collection Service, Inc.,* 911 F.2d 242, 243 (9th Cir. 1990) (per curiam) ("the low cost

22   commercial collection experts"), are premised upon vague and amorphous statements.

23       However, "'[a] specific and measurable advertisement claim . . . is not puffery.'" 4 J.

24   Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:38, at 27-67 (4th ed.

25   2004) (citation omitted).  If a statement may be quantified, it is not puffing.  *See Clorox Co. Puerto*

26   *Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 28 (1st Cir. 2000) (bleach – "Whiter is

27   not possible"); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1138 (9th Cir. 1997)

28

1   (slower growing grass).

2          In the instant case, each of IKON and GE's claims  is easily quantified and can be measured

3   against an objective standard – IKON and GE documents which show the falsity of the statements

4   made.  It certainly is not the sort of commercial puffing such as the "the low cost commercial

5   collection experts" that the authorities relied upon by IKON discuss.

6   **VII.    <u>CONCLUSION</u>**

7          For the reasons set forth above, the motions of IKON and GE to dismiss should be denied.

8   If the Court decides to grant either of the motions as to any claim for relief, plaintiffs should be

9   given leave to amend the First Amended Complaint.

10

11  Dated: April 8, 2005

12                                          Respectfully submitted,

13                                          HENNEFER & WOOD

14

15                                 By_____
                                          James A. Hennefer
16                                        Attorneys for Plaintiffs

17

18

19

20

21

22

23

24

25

26

27

28